## Wolf *v.* Christman, Appellant.

202    475
207    ¹ 15
202    475
d 24 SC ²217

*Equity—Equity practice—Finding of fact.*

Findings of fact by a trial judge in an equity case based on sufficient evidence will not be reversed by the appellate court except for clear error.

*Vendor and vendee—Warranty—Express representation—Caveat emptor.*

Where the vendee of a lot buys in reliance on a warranty or express representation by the vendor as to the depth of the lot, he is not within the rule of caveat emptor.

Argued Jan. 22, 1902. Appeal, No. 269, Jan. T. 1901, by defendant, from decree of C. P. No. 2, Phila. Co., March T., 1899, No. 115, on bill in equity in case of Frederick Wolf, Henry Wolf and Albert J. Wolf, Executors of Adam Wolf, *v.* William H. Christman. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Bill in equity for specific performance, or in the alternative to refund money paid.

Wiltbank, J., filed the following opinion:

### FINDINGS OF FACT.

1. On February 22, 1899, the defendant, William H. Christman, and his sister, Emily E. Christman, were the owners in fee of all that certain lot or piece of ground, with the brick messuage or tenement thereon erected, described according to a recent survey as follows, to wit: Beginning in the north line of Cherry street at a distance of fifty feet one inch eastward from Fourth street in the sixth ward of Philadelphia, thence extending northward by ground demised to John Seiser, fifty feet six inches, thence by ground demised to Mary Rainier, northeastward twenty feet, thence eastward twenty-four feet three inches, thence northward eleven feet three inches, thence eastward four feet five inches and thence northward five feet nine inches, thence eastward by ground formerly of Peter Wager, four feet seven inches, thence southward eighty feet to Cherry street, and thence westward along the north line of Cherry street forty-nine feet to the place of beginning, including on the west side thereof an alley four feet wide laid out by

the ministers, vestrymen and church wardens of the German Lutheran congregation in Philadelphia for the common use of said premises and of the premises adjoining to the west, known as Nos. 325 and 327 Cherry street.

2. On or about February 17, 1899, one Adam Baum negotiated with the plaintiff for the purchase by the latter of the lot of ground above described, and he had several interviews with him thereafter.

3. The plaintiff visited the property with Adam Baum for an inspection of it, and he found that the front on Cherry street was sufficient for his purposes. He then went along the side of the lot by an alleyway on the west side until he came to a small paling or fence some forty or fifty feet from the front, where he stopped and made inquiry of Baum as to the extension of the lot which he saw beyond the paling and which he assumed to be a part of the property discussed. Baum stated to him that the ground beyond the paling was a part of the property and that the entire depth of the lot was ninety feet. The plaintiff then stated to Baum that it was necessary that he should have a lot of the depth named, as it was his intention to build a brewery adjacent to and in the rear of a saloon which he proposed to open. He stated also to Baum that the land must be free of incumbrances. Baum's assurance was express both as to the depth and as to the freedom of the land from charge.

4. The plaintiff's intention to purchase the ground was formed upon his belief that the area of the lot was as he had stipulated, and this belief was warranted by the express statements of Baum, who negotiated with him. Up to this time the plaintiff had had no interview with the defendant, although at some time in the last week in January of 1899, Baum had brought the defendant to the plaintiff's then place of business at the corner of Third and Race streets. At that time the plaintiff was at work in the cellar of his establishment, and when Baum stated to him that the defendant was on the pavement outside awaiting an interview, the plaintiff declined to see him then owing to the pressure of the work he was at and the condition of his clothing.

5. On February 22, 1899, the plaintiff, accompanied by Adam Baum, called on the defendant at his residence in Wayne, Delaware county, Pennsylvania.

6. At that interview the defendant stated the selling price of the premises Nos. 325 and 327 Cherry street to be $15,500.

7. At that interview the plaintiff asked the defendant the size of the lot, and some conversation was had upon the subject, which led to the defendant's going to another part of his house and returning with a deed which he stated contained a description of the property.

8. The conversation between the two men was friendly, and the defendant showed to the plaintiff an old deed in the line of the title, which he exhibited as a curiosity and desired to retain as such should the plaintiff, as purchaser, permit him to do so. The plaintiff testified that the defendant read to him a part of this deed, but that he felt no interest in his doing so as it was in merely technical language, whilst, on the other hand, the defendant testified that he did not read a part of this deed, but he began to read from another deed which he then produced, the description of the land on Cherry street, and that the plaintiff stopped him, saying that he, the plaintiff, knew more of the property than did the defendant. The parties were conversing in an amicable spirit, without the attention of either being specially called to the significance of any reading, whether of the old deed or of the other, and no terms of sale were founded upon information given or obtained from the reading, whatever it was.

9. The premises in question were in fact of a width of forty-nine feet on Cherry street, and of a depth at the greatest width of fifty feet, whilst at their greatest depth, to wit: eighty feet, the width was only four feet seven inches.

10. The defendant informed the plaintiff at the interview of February 22, 1899, that the land was charged with an annuity of $400. The land was subsequently, to wit: on April 11, 1900, released from this charge. There is no other incumbrance upon the same.

11. The plaintiff paid to the defendant on February 22, 1899, $5,000 on account of the purchase money, and received a receipt for the same, and thereafter the defendant delivered to the Land Title and Trust Company title papers which the plaintiff subsequently obtained and entrusted to his conveyancer and architect. The execution of the contract advanced no further. The defendant remains in possession of the land, and

the plaintiff has not tendered him a deed for his execution and delivery, nor a bond for $10,500 accompanied by a mortgage of the land to secure the same.

12. It was discovered by the plaintiff's architect and conveyancer that the land was not of the depth contemplated, after the former had drawn plans for the erection of a brewery and had proceeded to an inspection of the premises, and after the latter had gone over the title papers obtained from the defendant through the trust company above named.

13. Some negotiations were had with the defendant in consequence of the discovery of the actual depth of the lot, during the course of which the defendant stated to one John Moller that the depth was ninety feet.   John Moller was the father of John C. Moller, the conveyancer employed by the plaintiff, and on or about March 10, 1899, he was in charge of his son's office during the absence of the latter when the defendant called in response to a note which had been written to him in behalf of the plaintiff.   The defendant asked John Moller the object of the letter, to which Moller replied that the plaintiff had been in the office, and added (addressing the defendant) : " You sold him forty-six feet front?   The defendant replied, ' That is correct.'   Moller continued, ' And ninety feet deep ? ' to which also the defendant replied, ' That is correct.'   Moller then showed the defendant the plan of the lot, which indicated irregularity in the boundaries, and the defendant's comment was, ' I didn't know that that was that shape; we inherited it, me and my sister."

### CONCLUSIONS OF LAW.

I am of the opinion that the plaintiff is entitled to equitable relief.   Were he seeking only to recover the sum of $5,000 paid by him on account of his purchase, his remedy would be at law, and the defendant would be entitled to a trial by jury (D'Utricht v. Melchor, 1 Dall. 428), but he shows more than this in making it clear that the lot referred to, if of a uniform depth of ninety feet, is of a special value to him for the purposes of his business, alike in extent and in situation.   He prays for a decree of rescission of the contract in the event of the defendant's being unable to convey to him what he undoubtedly contemplated in making his bargain, but primarily he seeks a

decree for specific performance otherwise. The defendant cannot specifically perform. The case is one of a failure of the minds of the parties to meet upon a point of essential importance and of a preponderance of the proofs in favor of the plaintiff, due to the vagueness of the testimony, perhaps the want of testimony, as to the agency of Baum. If Baum was the defendant's agent, the express, careful and reiterated declaration of the plaintiff met assurances that must be regarded as untrue and fraudulent in law. Apart from the action and assurances of Baum, however, the interview at Wayne of February 22, 1899, must be treated as one in which the plaintiff did all that was necessary to manifest that a depth of ninety feet in the lot was the basis of his offer, whilst the defendant failed to grasp the insistence of the plaintiff on that head and was, indeed, not himself precisely informed as to the dimensions of the lot. His interview later with the witness Moller, showed him to have been, at best for him, doubtful and rather of an impression that the needed depth was there. His conduct was in some degree careless at the Wayne meeting, and it may be apprehended that he took the plaintiff's money without due regard to the plaintiff's words. The plaintiff's mind may naturally have been reassured by the presence of Baum at that time, whose knowledge of his stipulation as to the depth was complete, and whom he may have looked upon not only as the defendant's representative but as one who had already reported fully to the defendant and obtained his confirmation of the bargain made for him. As was said in Babcock v. Day, 104 Pa. 4, " The mistake of the parties, which resulted from the fault of neither, was so essential, so material and substantial, as that it may reasonably be supposed that, but for the misdescription, they might never have entered into the contract at all. Under the peculiar and special facts of the case, if the injury had been but small, as compared with the consideration, we might hold the plaintiff to be without remedy, but the magnitude of the injury is such, that the plaintiff should obtain relief in some form : " Hovey v. Howard, 177 Pa. 323 ; Mays v. Dwight, 82 Pa. 462. The payment of $5,000 should be refunded and I think that interest should be allowed thereon from March 12, 1899, when the defendant learned definitely from Moller that the lot did not answer the description. Let a decree be drawn accordingly.

*Error assigned* was the decree of the court in favor of plaintiff.

*John Weaver*, with him *Frederick S. Drake*, for appellant.

*Julius C. Levi*, with him *David Mandel, Jr.*, for appellee.

PER CURIAM, May 19, 1902:

All of the appellant's numerous assignments of error, except one, are to the judge's findings or refusals to find facts. It is sufficient to say that the judge was amply sustained by evidence, and we see no reason to question his conclusions.

The remaining assignment to the conclusions of law cannot be sustained. The judge found that the plaintiff bought in reliance on a warranty or express representation as to the depth of the lot, which takes the case out of the rule of caveat emptor.

Judgment affirmed.