Elderkin et ux., Appellants, *v.* Gaster.

Argued April 22, 1971.   Before Bell, C. J., Jones, Eagen, O'Brien, Roberts, Pomeroy and Barbieri, JJ.

*Joseph T. Doyle,* with him *Trevaskis, Doyle, Currie, Nolan & Bunting,* for appellants.

*Dale A. Betty,* with him *Kassab, Cherry, Curran & Archbold,* for appellee.

OPINION BY MR. JUSTICE POMEROY, March 20, 1972:

This appeal arises out of a dispute concerning an agreement of sale, under the terms of which the appellants agreed to purchase from the appellee a lot and home to be constructed thereon. The water supply for this home was to be provided by a private well drilled on the lot. It is undisputed that appellee, the builder-vendor of the home, adequately constructed the home and the well; it is also undisputed that the well has never produced water of a quality suitable for human consumption. Appellants refused to release the remaining balance in the construction fund unless and until appellee would provide them with an adequate supply of unpolluted water. Appellee sued the appellants for the balance of the construction fund, whereupon appellants brought suit in equity against appellee praying that he be ordered to supply them with an adequate quantity of water fit for human consumption. The two causes were consolidated for hearing and tried before a judge sitting without a jury. The lower court ruled in favor of appellee in both suits and awarded appellee the monies due him under the construction agreement. Although finding that it was not appellee's duty to supply the home buyers with a source of potable water, the trial judge nevertheless ordered the builder-vendor to redrill the well to the deepest water bearing stratum on appellants' property. The Elderkins appeal,[1] and we reverse.

------

[1] As noted above, appellee's assumpsit action and appellant's equity action were consolidated for consideration in the lower

A more detailed statement of the background is necessary. The pertinent facts are as follows: Appellee Gaster subdivided an area of land owned by him and referred to in the record as Spring Valley, Middletown Township, Delaware County, into 32 lots, each approximately one acre in size. Gaster would sell a lot to an interested purchaser only if the purchaser concurrently agreed to have Gaster construct a home on the property. For sales purposes, appellee maintained a model home in the development.

On January 16, 1963, Gaster and the Elderkins entered into an agreement whereby the latter would purchase a lot and home in Spring Valley for a total consideration of $26,430, $500 of which was paid at the signing of the sales agreement. The balance was to be paid partially at settlement of the sale transaction and partially under the terms of a subsequently executed construction agreement. On January 31, 1963, appellee deeded a lot to appellants for the consideration of $6,000,[2] and the parties executed a construction agreement obligating the appellee to construct a house, similar to the display house, on appellants' lot. For this service appellant was to receive a total of $20,430 in installment payments to be paid at various stages of construction. It was the final $4,086 of this fund, withheld by appellants, that appellee was awarded by the lower court.

Attached to the construction contract was a list entitled "Description of Materials", which noted the de-

court. Although we are herein concerned solely with an appeal from the decree in equity, counsel for the parties have stipulated that, since the issues involved in the assumpsit and the equity actions are the same, the result this Court reaches in the equity appeal will likewise have binding effect on the assumpsit action.

[2] We note that conveyance of a lot before a home is constructed upon it would normally result in substantial savings of realty transfer tax.

tailed specifications of the materials which would be used in constructing the several parts of the Elderkins' home. Pertinent to this case is the notation, under heading "Plumbing", that the water supply would be by "individual (private) system."[3] Otherwise, the agreement of sale, the deed to the lot, and the construction agreement are silent on the matter of water supply or the quality of the water to be supplied.[4]

Appellants took possession of the premises on June 1, 1963, when the house, except for the private well, was substantially completed. The well was completed and water supplied to the home on June 17, 1963.[5] Shortly thereafter appellants had the water from their well tested by chemical analysis.[6] These tests showed the water to contain concentrations of organic nitrates and synthetic detergent in excess of the limits noted by the "Public Health Service Drinking Water Standards (Revised 1962)" published by the United States Department of Health, Education and Welfare.[7] Appellants continued to have tests performed on their

---

[3] Sewage disposal was also to be by "individual (private) system."

[4] It is clear from reading the record that both Mr. and Mrs. Elderkin were aware of possible contamination problems in a private water system. They both testified that appellee Gaster told them the water from the well would be good for drinking, although appellee denied having made any representations as to the quality of the water. The lower court made no finding as to whether any representations had been made to or relied upon by the appellants.

[5] The record shows that from June 1 until June 17 appellants obtained their necessary water supply by means of a hose attached to a nearby home.

[6] The testimony indicates that all tests involved were made by laboratories approved by the Pennsylvania Department of Health.

[7] These standards are approved by the United States Public Health Service and according to the expert testimony are accepted as the standards employed by the Commonwealth of Pennsylvania with regard to purity of public water supplies.

water supply up to the time of the lower court hearing in this case in 1967. The tests consistently showed the nitrate content of the well water to be at least four times greater than the standard promulgated by the United States Department of Health, Education and Welfare.[8] All of the experts testifying in the lower court agreed that because of this condition appellants' water supply was unfit for human consumption.[9]

On this appeal appellants maintain that the builder-vendor of a home impliedly warrants that the home has been constructed in a reasonably workmanlike manner and that the dwelling is habitable. As applied to their particular home, appellants contend that this warranty was breached because they were not supplied with an adequate source of potable water.

Appellee Gaster's argument, accepted by the lower court, is two-fold: (1) the deed of appellants' lot carried with it the rights to subsurface water and if any warranties as to its quality were to come into existence, these qualities had to be expressly stated in the deed

---

[8] As of the time of trial, appellants continued to live in their Spring Valley home, supplying themselves with potable water by filling containers with water obtained from a source outside the Spring Valley area. Although appellee offered to redrill a well on appellants' property, he simultaneously demanded that appellants accept this act as full performance of the contract. Appellants refused this offer, asserting that the builder-vendor's obligation is to supply them with a source of potable water, even if it necessitates running public water to their home. Testimony in the lower court estimated the costs of supplying public water to the Elderkins' home to be in excess of $14,000.

[9] The testimony also disclosed that, while unfit for any human consumption, water containing excessive nitrate concentrations can be most toxic to infants. The above noted Department of Health, Education and Welfare standards specifically state: "In the areas in which the nitrate content of water is known to be in excess of the listed concentration, the public should be warned of the potential dangers of using the water for infant feeding."

(which they were not) ; and (2) that any implied warranty that a structure will be completed in a workmanlike manner and be reasonably fit for the purpose intended extends only to completing a functional well and does not extend to the purity of the water produced by the well.

Appellants urge this Court to view the instant transaction as the sale of a "single-package" by the builder-vendor, as opposed to a situation involving two isolated transactions, viz., (1) the conveyance of the lot by deed and (2) the construction of the house according to contract. The lower court treated the transaction severably, stating that "[t]he single-package theory pushed for by [appellants], falls into the deep pit of caveat emptor. . . ."

The record plainly shows that the appellee was a real estate developer and was the builder-vendor of appellants' residence.[10] Although the sale of the lot and home was consummated in a two-step process, it is clear that the basic agreement between the parties was that appellee would furnish appellants, for an agreed consideration, a home located in appellee's development. In fact, appellants could not have moved into the development had they not agreed to purchase *both* the house and lot from appellee. Accordingly, we direct our attention to whether any warranties are implied by a builder-vendor when he sells a "single-package"—a new house and a lot—to his customer.

The common law doctrine of *caveat emptor,* the antithesis of implied warranty, historically applied to sales of both real and personal property in this Commonwealth, although its application to personal property sales has been restricted by the enactment of the

---

[10] A builder-vendor, as the term is here employed, refers to one who buys land and builds homes upon that land for purposes of sale to the general public.

Uniform Commercial Code, Act of October 2, 1959, 12A
P.S. §1-101 et seq. Generally speaking, the rule is that
in the absence of fraud or misrepresentation a vendor
is responsible for the quality of the property being sold
by him only to the extent for which he expressly agrees
to be responsible.[11] See, e.g., *Wolf v. Christman*, 202
Pa. 475, 51 Atl. 1102 (1902); *Pringle v. Rogers*, 193
Pa. 94, 44 Atl. 275 (1899); *Shisler v. Baxter*, 109 Pa.
443 (1885); *Lord v. Grow*, 39 Pa. 88 (1861); *Bailey
v. Gibson*, 20 Pa. Superior Ct. 429 (1902). The theory
of the doctrine is that the buyer and seller deal at arm's
length, each with an equal means of knowledge con-
cerning the subject of the sale, and that therefore the
buyer should be afforded only those protections for
which he specifically contracts. Appellant argues that
while this postulate may have continuing validity with
regard to real estate transactions generally, it is un-
realistic as applied to sales of new homes by a builder-
vendor.

There are but few Pennsylvania decisions concerned
with attaching implied warranties to the sale of a new
home. In *Stewart v. Trimble*, 15 Pa. Superior Ct. 513
(1901) and *Raab v. Beatty*, 96 Pa. Superior Ct. 574

---

[11] Closely related to the doctrine of *caveat emptor* is what is
known, in Pennsylvania, as the doctrine of merger. This latter doc-
trine, normally applied to warranties of title, holds that all war-
ranties and representations in connection with a sale or other trans-
action made prior to or contemporaneous with a deed are merged
into the deed and that unless therein expressly provided for, they
are forever lost. See, e.g., *Dick v. McWilliams*, 291 Pa. 165, 139
Atl. 745 (1927); *Stoever v. Gowen*, 280 Pa. 424, 124 Atl. 684 (1924);
*Dobkin v. Landsberg*, 273 Pa. 174, 116 Atl. 814 (1922). See gen-
erally Nicholson, *Pennsylvania Law of Real Estate*, §154 (3d ed.
1929); *Restatement, Contracts*, §413 (1932). A corollary to the
doctrine of merger is that delivery of the deed does not foreclose
inquiry into those matters not intended to be controlled by the deed
or which are collateral to the deed. See *Dick v. McWilliams, supra;*
*Dobkin v. Landsberg, supra; Harbold v. Kuster*, 44 Pa. 392 (1863).

(1929) our Superior Court held that a builder-vendor impliedly warrants good workmanship in the completion of what was at the time of sale a partially constructed building. Neither of these decisions involved an implied warranty of habitability,[12] but an English case substantially similar to *Raab v. Beatty, supra,* has been cited as the basis for a series of American decisions holding that the sale by its builder-vendor of a new home in the process of construction is accompanied by implied warranties of workmanlike construction and habitability. *Miller v. Cannon Estates, Ltd.,* [1931] 2 K.B. 113. This chain of cases from other jurisdictions includes *Glisan v. Smolenske,* 153 Colo. 274, 387 P. 2d 260 (1963); *Weck v. A. M. Sunrise Construction Co.,* 36 Ill. App. 2d 383, 184 N.E. 2d 728 (1962); but see *Coutrakon v. Adams,* 39 Ill. App. 2d 290, 188 N.E. 2d 780 (1963); *Vanderschrier v. Aaron,* 103 Ohio App. 340, 140 N.E. 2d 819 (1957); *Jones v. Gatewood,* 381 P. 2d 158 (Okla. 1963); *Hoye v. Century Builders,* 52 Wash. 2d 830, 329 P. 2d 474 (1958). See also *Perry v. Sharon Development Co.,* [1937] 4 All. E.R. 390 (C.A.). The thesis of all these decisions is succinctly summarized in a quotation from *Miller v. Cannon Hill Estates, supra,* at 121: "[T]he whole object, as both parties know, is that there shall be erected a house in which the intended purchaser shall come to live. It is the very nature and essence of the transaction between the parties that he will have a house put up there which is fit for him to come into as a dwelling house. It is plain that in those circumstances there is an im-

---

[12] Several Pennsylvania lower court cases have held that with regard to building contracts there is an implied warranty of reasonable workmanship and fitness for the intended purpose. See *Koval v. Country and Town Homes, Inc.,* 9 Cumb. L. J. 109 (C.P. 1958); *Harrison v. Heagy,* 81 Dauph. 7 (C.P. 1963); *McKeever v. Mercaldo,* 3 Pa. D. & C. 2d 188 (Mont. C.P. 1963). See also *Wade v. Haycock,* 25 Pa. 382 (1855).

plication of law that the house shall be reasonably fit for the purpose for which it is required, that is for human dwelling."

Shortly after its decision in *Glisan v. Smolenske, supra,* the Colorado Supreme Court noted that the *Miller* rationale applied to the sale of new homes by a vendor-builder regardless of the stage of construction, i.e., partial completion or total completion, when the home was purchased. "That a different rule should apply to the purchase of a house which is near completion than would apply to one who purchases a new house seems incongruous." *Carpenter v. Donohoe,* 154 Colo. 78, 83, 388 P. 2d 399, 402 (1964). Since the *Carpenter* decision, nine other jurisdictions have likewise restricted the application of the doctrine of *caveat emptor,* holding it inapplicable to sales of new homes where the vendor is also the builder. *Wawak v. Stewart,* 247 Ark. 1093, 449 S. W. 2d 922 (1970); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P. 2d 698 (1966); *Weeks v. Slavick Builders, Inc.,* 24 Mich. App. 621, 180 N.W. 2d 503, aff'd, 384 Mich. 257, 181 N.W. 2d 271 (1970); *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A. 2d 314 (1965); *Rutledge v. Dodenhoff,* 254 S.C. 407, 175 S.E. 2d 792 (1970); *Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 154 N.W. 2d 803 (1967); *Humber v. Morton,* 426 S.W. 2d 554 (Tex. 1968); *Rothberg v. Olenik,* 128 Vt. 295, 262 A. 2d 461 (1970); *House v. Thornton,* 76 Wash. 2d 428, 457 P. 2d 199 (1969). See also *Robertson Lumber Co. v. Stephen Farmers Coop. Elev. Co.,* 274 Minn. 17, 143 N. W. 2d 622 (1966). These decisions all hold that the builder-vendor of a new home impliedly warrants reasonable workmanship and habitability.[13] The warranties ap-

---

[13] The cases generally note that reasonable workmanship is not the equivalent of building perfection, but must be viewed as meaning reasonable under the circumstances. See, e.g., *Bethlahmy v.*

pear to apply whether the homes are purchased prior to construction, during construction, or after the dwelling has been constructed but not yet occupied.[14]

Typical of the reasoning of these cases is that of the New Jersey Supreme Court in *Schipper v. Levitt & Sons, Inc.,* 44 N.J. at 91-92, 207 A. 2d at 326: "[The] contention that *caveat emptor* should be applied and the deed viewed as embodying all the rights and responsibilities of the parties disregards the realities of the situation. *Caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed.

---

*Bechtel, supra; Schipper v. Levitt & Sons, Inc., supra; Waggoner v. Midwestern Development, Inc., supra.* In a recent case following *Carpenter v. Donohoe, supra,* the Supreme Court of Colorado noted that what is "habitable" is not easily defined and must be approached on a case by case basis. *Mulhern v. Hederich,* 163 Colo. 275, 430 P. 2d 469 (1967).

[14] The erosion of the doctrine of *caveat emptor* in the situation before us is recorded by the change in text which has occurred in revisions of Professor Williston's treatise on contracts. At 4 Williston, *Contracts,* §926 (Rev. ed. 1936), it is noted that in sales of real estate there are no implied warranties, but in 7 Williston, Contracts, §§926, 926A (3d ed. 1963), edited by Professor Jaeger, it is stated that although the doctrine of *caveat emptor* is still broadly applied in real estate sales, some courts have been inclined to make "an exception in the sale of new housing where the vendor is also the developer or contractor."

See in general as illustrative of the extensive recent literature on the subject of implied warranties in the sale of new homes, Bearman, Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule, 14 Vand. L. Rev. 541 (1961) ; Dunham, Vendor's Obligation as to Fitness of Land for a Particular Purpose, 37 Minn. L. Rev. 108 (1953) ; Halpern, Courts Grant Protection to Buyers of New Houses, 5 Wharton Quarterly No. 1, p. 23 (1970) ; Roberts, The Case of the Unwary Home Buyer, 52 Cornell L.Q. 835 (1967) ; Young and Harper, Quaere: Caveat Emptor or Caveat Venditor, 24 Ark. L. Rev. 245 (1970). Bixby, "Let the Seller Beware: Remedies for the Purchase of a Defective Home", Comment, 49, Journal of Urban Law 533 (1972). See also *annot.* 25 A.L.R. 3d 383, 414 (1969).

Buyers of mass produced development homes are not on an equal footing with the builder-vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale." Similarly, the Supreme Court of Texas in *Humber v. Morton*, 426 S.W. 2d at 562 concluded: "The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself. . . ."

In *Kellogg Bridge Co. v. Hamilton*, 110 U.S. 108, 28 L. Ed. 86 (1884), the Supreme Court, speaking through the first Mr. Justice HARLAN, stated that the law will imply a warranty of fitness for the purpose intended when a buyer has reason to rely upon and does rely upon the judgment of a seller who manufactures the product. We have concluded that one who purchases a development house conforms to this standard; he justifiably relies on the skill of the developer that the house will be a suitable living unit. Not only does a housing developer hold himself out as having the necessary expertise with which to produce an adequate dwelling, but he has by far the better opportunity to examine the suitability of the home site and to determine what measures should be taken to provide a home fit for habitation. As between the builder-vendor and the vendee, the position of the former, even though he exercises reasonable care, dictates that he bear the risk that a home which he has built will be functional and habitable in accordance with contemporary community standards. We thus hold that the builder-vendor impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for the purpose intended—habitation.

Having reached this conclusion, it remains to consider whether the deficiency of which appellants complain is within the purview of this warranty. Most of the cited cases supporting the theory of implied warranty of reasonable workmanship and habitability were factually concerned with structural defects rendering the home unfit for habitation.[15] In several cases, however, the implied warranty of habitability was found to have been breached not because of structural defects, but because of the unsuitable nature of the site selected for the home. See *Mulhern v. Hederich,* 163 Colo. 275, 430 P. 2d 469 (1967); *Glisan v. Smolenske, supra; Waggoner v. Midwestern Development Co., supra; House v. Thornton, supra; Jennings v. Tavener* [1955] 2 All. E.R. 769 (Q.B.).[16] This seems to be a natural

---

[15] *Crawley v. Terhune,* 437 S.W. 2d 743 (Ky. Ct. App. 1969) adopted the theory of implied warranty only to the extent that the "major structural features" are constructed in a workmanlike manner using good materials.

[16] In *Glisan v. Smolenske, supra,* and in *Mulhern v. Hedrich, supra,* a builder-vendor was held to have breached the implied warranty of habitability by not protecting against soil defects which ultimately caused the foundation of the respective homes to shift.

Even more analogous to the case before us is *Waggoner v. Midwestern Development Co., supra,* where the breach of implied warranty for fitness was caused by water from an underground spring seeping into the basement of the home. The court specifically noted that there was no evidence that the builder-vendor knew or should have known of the underground water, but because he selected the homesite the builder was in the better position to protect against the hazard involved. A similar rationale was employed by the Supreme Court of Washington in *House v. Thornton, supra,* where the foundation of a house began to crumble because of the instability of the land upon which it was situated. In the latter case, the builder-vendor before beginning construction had been assured by municipal engineers that the land would be suitable as a homesite.

Lastly, the court in *Jennings v. Tavener, supra,* held that a builder-vendor breached the warranty of habitability when he failed to guard against the danger "that the proposed site of a house may

application of the implied warranty of habitability of the home, since selection and subdivision of the home sites are within the exclusive domain of the builder-vendors. The developer holds himself out, not only as a construction expert, but as one qualified to know what sorts of lots are suitable for the types of home to be constructed. Of the two parties to the transaction, the builder-vendor is manifestly in a better position than the normal vendee to guard against defects in the home site and if necessary to protect himself against potential but unknown defects in the projected home site.

While we can adopt no set standard for determining habitability, it goes without saying that a potable water supply is essential to any functional living unit; without drinkable water, the house cannot be used for the purpose intended. Accordingly, we find the implied warranty of habitability to have been breached by the appellee in the instant case.

We reverse the decree below and remand for further proceedings consistent with this opinion. Since the lower court did not reach the question of relief to be granted to the appellants, we express no opinion on that subject. Costs to be equally divided between the parties.

The former Mr. Chief Justice BELL and the former Mr. Justice BARBIERI took no part in the decision of this case.

———

CONCURRING OPINION BY MR. JUSTICE EAGEN:

It was once well said that "law is the application of reason to human relations." This being so, then *good law* must be the application of *right* reason to

———

be unfit for that purpose because moisture has been extracted from it by the roots of such quickgrowing trees as poplars growing in the immediate neighborhood of the site."

human relations. Mr. Justice POMEROY has performed this function admirably in this case. I wholeheartedly join in his opinion.