POTTER *v.* DANGLER MOBILE HOMES ET AL.
[Cite as Potter v. Dangler (1977), 61 Ohio Misc. 14.]

(No. CI-76-211—Decided December 14, 1977.)

Common Pleas Court of Paulding County.

*Rodney M. Arthur Co., L.P.A., Mr. J. D. Reeves* and *Mr. Phil W. Campbell,* for plaintiff.

*Messrs. Hyman, McMaster, Cook & Webb* and *Mr. Norman E. Cook,* for defendant Dangler Mobile Homes.

*Weaner, Hutchinson, Zimmerman & Bacon* and *Mr. Roger V. Bacon,* for defendant Fairmont Homes, Inc.

HITCHCOCK, J.   This cause was tried to the court on May 26, 1977 and June 16, 1977, and the court finds, by a preponderance of the evidence, the following as—

## FACTS

Plaintiff visited mobile home sales agencies in the vicinity of Fort Wayne, Indiana, and discovered one to his liking manufactured by defendant Fairmont Homes, Inc. (Fairmont). He returned to Paulding to Dangler Mobile Homes, the trade name of the proprietorship of Gene N. Dangler (Dangler) the other defendant herein who has operated a mobile home business in Paulding for the last 9 years. Plaintiff did this because of past dealings with Dangler which convinced him that Dangler was an honorable and trustworthy businessman, an opinion he continues to hold.

After discussing various features of the Village Green model, plaintiff, on March 28, 1974, confirmed an order for a particular model No. 6024-3B-SW with specified desired features among which were "electric furnace" and "Total Electric" fixtures all to be delivered to Cecil, Ohio, without set-up or foundation for $13;900. Although Dangler had sold some Fairmont mobile home units previously this was the first "double-wide" Fairmont unit sold by him.

Plaintiff understood that said mobile home was to have the special insulation commonly provided for efficient electric heat in this area in the winter time. Pursuant to this confirmed order defendant Fairmont delivered the ordered unit and billed Dangler on itemized invoice No. 009076 dated 5-23-74 for a total price of $11,523.

16

Among the items appears one reading as follows:

"All Electric Package                                    325.00

"Special Insulation

"Electric Range

"30 Gal. Electric Water Heater F210

"307 Electric Furnace F013

"200 AMP Service"

Plaintiff is not in default for payments on the home. After having much difficulty with condensation, internal frost, and high electric bills the winter of 1974-75, plaintiff employed one Curtis W. Shafer, a regular employee of Johns Manville Fiberglass Corporation who had substantial experience in home insulation, to insulate plaintiff's mobile home. Shafer was assisted by plaintiff's next door neighbor, Lewis A. Mosier. Plaintiff paid Shafer at least $350 and Mosier $407 and paid $208 for wall insulation materials. About 15 percent of the wall area was found to be completely without any insulation and substantial additional areas to have quite thin insulation, about ½ of what plaintiff expected from having examined Fairmont sales literature at the Dangler agency. Although plaintiff is gainfully employed at a substantial salary he is able to read and write practically nothing except his name. Later, in the fall of 1975, plaintiff paid at least $300 for additional insulation in the ceiling of the mobile home.

Peter Wilhelm, a man of long experience in home construction, who also operates a mobile home sales agency and rental park in early 1975 inspected plaintiff's mobile home and gave an estimate for properly insulating the home at $3,250.

Plaintiff complained to Dangler in the 1974-75 winter period and Dangler relayed the complaints to Fairmont and requested service but same was not forthcoming. Dangler did visit plaintiff and suggest that he might possibly obtain an additional $200 for plaintiff in insulating material but plaintiff never indicated he would be satisfied with such adjustment.

Plaintiff did show Dangler several areas without insulation when they began reinsulation of their mobile home but neither Dangler or any representative of Fairmont was present at the time the siding was pried loose to see what insulation lay beneath.

There has been substantial water damage to a number of interior panels and to the carpet. Twenty such panels worth $9 each should be replaced, and $300 is needed to replace the damaged carpet.

Fairmont's director of service insists that the moisture problems of which plaintiff complains is caused by both under insulation and over insulation but he failed to give any scientific explanation of what the optimum insulation for plaintiff's mobile home should be. Moreover, he revealed no information as to what insulation definitely was or should have been built into the unit and why the same was adequate for the variety of winter weather typical of the weather history of any 21 year or greater period in Northwestern Ohio. Nor did either the seller or the manufacturer show that the provided "all electric package" was or should have been adequate for at least 95 percent of the varying kinds of weather this community experiences over the years.

The mobile home accepted by and paid for by plaintiff was not suitably fit for the purpose of human habitation in an ordinary manner in this vicinity, which is the purpose it was to serve as known to both the buyer and the seller and the manufacturer. The reason was lack of appropriate insulation, a defect not observable until freezing weather disclosed the fact. Notice of the inadequacy of the unit's insulation was given to the seller within a reasonable time after its discovery which was in turn relayed to the manufacturer. Defendant Dangler attempted to cause defendant Fairmont to correct the disclosed defect and /or replace the unit. The manufacturer failed to respond by either replacing the unit with a suitable like unit or to refund a portion of the purchase price agreeable to the purchaser by reason of the disclosed deficiency within 30 days of receiving the complaint.

## LAW

At the time of this transaction in early 1974, Ohio versions of "The Uniform Commercial Code-Sales"—R. C. 1302.01 to 1302.98—and "The Uniform Consumer Sales Practices Act"—R. C. 1345.01 to 1345.13—were in full force and effect, the former since July 1, 1962, and the latter since July 14, 1972. By January 1, 1977, the former of these acts had been adopted by the 48 other states and the District of Columbia; and the latter by two other states, Kansas and Utah.

Consequently, the Uniform Commercial Code governed all conduct of both defendants and the Uniform Consumer Sales Code governed the Ohio defendant certainly and the non-resident of Ohio defendant has failed to advance any reason why the law of this forum should not bind it in this action and it is, in the circumstances, charged with knowledge of the destination where this unit was to be used.

R. C. 1301.06 (UCC 1-106) provides that its remedies are to be liberally administered.

Both defendants are described in these acts as follows:

In Ohio's version of the Uniform Consumer Sales Practices Act, effective since July 14, 1972 (adopted by only two other states, Utah and Kansas), R. C. 1345.01 to 1345.13, we find, in pertinent part:

R. C. 1345.01 "(C) 'Supplier' means a seller***or other person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer."

R. C. 1345.02 "(B) Without limiting the scope of division (A) of this section. The act or practice of a supplier in representing any of the following is deceptive:

"(1) That the subject of a consumer transaction has ***performance characteristics, accessories***or benefits it does not have;

"***

"(6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends."

R. C. 1345.03 "(A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

"(B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration.

"***

"(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment."

R. C. 1345.09 "For a violation of Sections 1345.01 to 1345.13 of the Revised Code, a consumer has a cause of action and is entitled to relief as follows:

"(A) Where the violation was an act prohibited by section 1345.02 or 1345.03 of the Revised Code, the consumer may, in an individual action, rescind the transaction or recover his actual damages."

R. C. 1345.11 "In any case arising under sections 1345.01 to 1345.13 of the Revised Code, if the supplier shows by a preponderance of the evidence that a violation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error, no liability is imposed."

Ohio has also, as have all the states save Louisiana —which did adopt four articles—The Uniform Commercial Code, effective July 1, 1962, and the portion relating to Sales is found in R. C. 1302.01 to 1302.98. Pertinent provisions are found as follows:

R. C. 1302.01 "(A) As used in sections 1302.01 to 1302.98, inclusive, of the Revised Code, unless the context otherwise requires:

"(1) 'Buyer' means a person who buys or contracts to buy goods.
"* * *

"(4) 'Seller' means a person who sells or contracts to sell goods.

"(5) 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.
"* * *

"(12) Goods * * * are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract.

"(13) 'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the cancelling party *also retains any remedy* for breach of the whole contract or any unperformed balance." (UCC 2-103 to 2-106.)

R. C. 1302.27 "(A) Unless excluded or modified as provided in section 1302.29 of the Revised Code, a warranty that

the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.***

"(B) Goods to be merchantable must be at least such as: "***

"(3) are fit for the ordinary purposes for which such goods are used; and

"(4) run, within the variations permitted by the agreement, or even kind, quality and quantity within each unit and among all units involved; and

"(5) are adequately contained, packaged, and labeled as the agreement may require; and

"(6) conform to the promises or affirmations of fact made on the container or label if any.

"(C) Unless excluded or modified as provided in section 1302.29 of the Revised Code, other implied warranties may arise from course of dealing or usage of trade." (UCC 2-314)

R. C. 1302.28 "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is *unless excluded* or *modified* under section 1302.29 of the Revised Code an implied warranty that the goods shall be fit for such purpose." (UCC 2-315)

R. C. 1302.66 "(A) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:

"(1) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(2) without discovery of such non-conformity if his acceptance was reasonably induced *either by the difficulty of discovery before acceptance* or by the seller's assurances.

"(B) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(C) A buyer who so revokes has *the same rights* and duties with regard to the goods involved as if he had rejected them." (UCC 2-608.)

R. C. 1302.67 "(A) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired.*** "****

"(C) *Acceptance of any improper delivery* or payment *does not prejudice the aggrieved party's right* to demand adequate assurance of future performance.

"(D) *After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days* such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." (UCC 2-609.)

R. C. 1302.85 "(A) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, as provided in section 1302.70 of the Revised Code, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid:

"(1) 'cover' and have damages under section 1302.86 of the Revised Code as to all the goods affected whether or not they have been identified to the contract; or "****

"(C) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care, and custody and may hold such goods and resell them in like manner as an aggrieved seller as provided in section 1302.80 of the Revised Code." (UCC 2-711.)

R. C. 1302.86 "(A) After a breach within the preceding section, the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(B) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in section 1302.80 of the Revised Code, but less expenses saved in consequence of the seller's reach.

"(C) Failure of the buyer to effect cover within this section does not bar him from any other remedy." (UCC 2-712.)

R. C. 1302.87 "(A) Subject to the provisions of section 1302.97 of the Revised Code, with respect to proof of market price, the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in section 1302.89 of the Revised Code, but less expenses saved in consequence of the seller's breach.

"(B) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival." (UCC 2-713.)

R. C. 1302.88 "(A) Where the buyer has accepted goods and given notification as provided in division (C) of section 1302.65 of the Revised Code, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(B) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(C) In a proper case any incidental and consequential damages under section 1302.89 of the Revised Code may also be recovered." (UCC 2-714.)

R. C. 1302.89 "(A) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(B) Consequential damages resulting from the seller's breach include:

"(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(2) injury to person or property proximately resulting from any breach of warranty." (UCC 2-715.)

Today it has been recognized that when a builder builds a house for a purchaser he does, in the absence of some express limitation knowingly and effectively made, impliedly warrant that the house so built and sold is constructed in a reasonably workmanlike manner and that it is fit for human habitation. *Elderkin* v. *Gaster* (1972), 447 Pa. 118, 288 A. 2d 771. Clearly the statutes of Ohio require no less from sellers of mobile homes to those who expect to use them at an Ohio address known to the sellers as here. In construction of housing facilities Ohio has from the beginning required a high standard of performance and provided for adequate damages for failure to meet the same. See *Somerby* v. *Tappan* (1833-1834), Wright 229, 570. The Weather Bureau, U. S. Department of Commerce, has existed since 1870 and its records are not kept secret from any seller or any citizen. Any structure sold for purposes of human habitation, whether mobile home or ordinary house, needs as a minimum to provide those characteristics necessary to effectively meet the range or weather conditions found in the area of use over a significant period of years—probably 21 or more—or unsuitability may be presumed.

From the facts established by the evidence it is clear that the mobile home purchased by the plaintiff was not, as received, reasonably fit for human habitation during a winter not characterized by any rare, quite unusual weather conditions of extreme severity. Over 10 percent of the wall space where insulation would be expected contained none. From the ordering of a special electric package this court takes judicial notice of the fact that in this community for well over 10 years it has been widely recognized that homes cannot be heated economically by electricity unless they are carefully and correctly insulated. Further, defendant Fairmont made no defense as provided by R. C. 1302.29 (UCC 2-316) or R. C. 1345.11, or other code provision.

When plaintiff discovered that his mobile home was not suitable for winter habitation this fact was reported to the sellers, the defendants. Of these Dangler was the local merchant of mobile homes and Fairmont was the manufacturer of same. Both, as the Revised Code shows, are responsible to plaintiff for curing the existing defects which unless corrected in fact, or guaranteed in fact to be done within a

reasonable time, within 30 days after complaint seasonably made in the circumstances, as here; are subject to his complaint and from them "he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."

Consequently, the court finds that plaintiff is entitled to damages as follows:

| | |
|---|---:|
| Wages paid Curtis W. Shafer | $350 |
| Wages paid Lewis A. Mosier | 407 |
| Amounts paid for insulation material | 508 |
| Value of his own time to correct trouble | 700 |
| For panel replacement | 180 |
| For carpet replacement | 300 |
| For pain, suffering and discomfort | 1,000 |
| | $3,445 |

And all this with interest from November 1, 1975, together with a reasonable attorney fee of $1,000.

In the circumstances shown by the evidence, however, the true proximate cause of plaintiff's injury rests upon conduct of the seller manufacturer, Fairmont. Consequently, on old principles of indemnity which place, in protecting the deserving plaintiff, full responsibility on actual rather than nominal wrongdoers, judgment will be entered finding Fairmont primarily liable for damages and costs with Dangler secondarily liable. See *McMurray* v. *Vaughn's Seed Store* (1927), 117 Ohio St. 236, 157 N.E. 567. Although this court must conclude that defendant Dangler is made responsible by the terms of the code it cannot find him at fault for (1) having any prior knowledge of unsuitability or likelihood thereof, (2) not performing any common or accepted inspection, prior to delivery, for the conditions ultimately revealed; and (3) for doing or failing to do anything that an honorable retail merchant should or should not have done in the circumstances. As such conduct should be encouraged on the part of the person with knowledge of the subject who meets and deals with the general lay public this court has arrived at the conclusion that in the circumstances here, he should be held to be only secondarily liable to plaintiff unless some statute or rule positively prohibits such finding. This the court has not been able to find.

Defendant Fairmont may protest that the evidence is insufficient to fairly prove the facts found by the court. The court has considered this point and perceives nothing incredible in the evidence and testimony of plaintiff and his witnesses. Said defendant had full opportunity to inform the court of exactly how this complicated, expensive article of commerce was made and what precautions, if any, had been taken to prevent the trouble complained of and what action was taken to correct plaintiff's trouble within 30 days of receipt of its first report of same. It failed to respond in any matter of substance so there is no reason why the court should not accept plaintiff's proof at its face value as it has done.

*Judgment accordingly.*