159 N.J. Super. 1 (1978)
386 A.2d 1325
HENRY P. MC DONALD AND BARBARA MC DONALD, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
JOSEPH S. MIANECKI AND DELORES MIANECKI, HIS WIFE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1977.
Decided April 13, 1978.
*5 Before Judges FRITZ, BOTTER and ARD.
Mr. C. William Bowkley, Jr., argued the cause for the appellants (Messrs. Seeber & Bowkley, attorneys).
Mr. William R. Albrecht argued the cause for the respondents (Messrs. Schenck, Price, Smith & King, attorneys).
The opinion of the court was delivered by ARD, J.A.D.
This appeal involves an action by the purchasers of a new residential home against the builder-vendor. The primary issue presented is whether, under the circumstances *6 of this case, the purchasers are entitled to bring such an action on the grounds of a breach of an implied warranty of fitness or habitability.
Defendants Mr. and Mrs. Mianecki (vendors), appeal from verdicts in favor of plaintiffs Mr. and Mrs. McDonald (purchasers), after a bifurcated trial on liability and damages. The damage verdict amounted to $32,000. The vendors had also filed third-party actions against several parties. All were dismissed by the judge before the jury began deliberations except as against Deran Sales, Inc. The jury returned a verdict of "no cause for action" in favor of Deran Sales, Inc. Thereafter the vendors' motion for judgment n.o.v. or a new trial was denied.
The parties entered into a contract whereby vendors agreed to construct a new residential dwelling for purchasers and to convey title to them for the sum of $44,500. The house was to be serviced by well water. There were no express warranties in the agreement concerning the potability of the well water.
In an effort to reduce costs the parties agreed to have purchasers paint the interior while the house was being constructed. While using the well water to clean brushes, purchasers noticed that the sinks became stained. The vendors explained that this was a new well and perhaps there were still impurities in the water.
The vendors were required to have the water tested before a certificate of occupancy would be issued. The test indicated a high iron content and a filter was recommended. A water conditioner was installed by Deran Sales, Inc., whose representative advised that the water conditioner would correct the iron condition. Following its installation, the water was again tested by Duncan Medical Laboratory and found to be drinkable. A certificate of occupancy was issued.
Title was closed on November 15, 1972. A deed with the usual guarantees of title was delivered. There is no allegation by the purchasers that the deed contained an express warranty of construction, fitness or habitability.
*7 The purchasers moved into the house on November 17, 1972. Mrs. McDonald had already cleaned the sinks and removed the stains with a product (Rust Raze) purchased from vendors. However, once the water use was resumed, the stains reappeared and the fixtures were stained a "chocolaty brown." The purchasers also noticed a knocking and spouting in the pipes when the shower was used. Mr. Mianecki explained that this was probably due to air in the pipes which would subside in time. The knocking did not stop notwithstanding two attempts by a plumber to correct the condition. An attempt was also made to eliminate the staining problem by back-flushing the water conditioner, but to no avail. The drilling contractor was called back to check the system and correct the malfunctions. Again, no improvement was noticed.
Also, in November 1972 the purchasers' washing machine stopped working. Prior to the breakdown entire loads of wash were being permanently stained. In March 1973 the dishwasher went out of order.
It was then discovered that "air" was in the water conditioning system. A manually operated petcock valve was installed. This reduced the banging but the staining continued. The vendors constantly worked on the system, employing the plumber, water conditioning man and the well driller in an unsuccessful effort to discover the source of the problem.
While working on the initial problems another problem appeared. Fine sand was found in the water supply. The well pump was raised in an effort to cure this problem. Meanwhile, the purchasers were continuously working on the fixtures. Despite repetitive cleaning, the staining persisted.
From January 1973 the purchasers were constantly in touch with the vendors as the water problem became progressively worse. The water had an offensive odor. It fizzled like "Alka-Seltzer" when allowed to stand. In addition to the fixtures mentioned, the water stained the bathroom ceramic title and the stainless steel shower door. By March 1973 the purchasers and their family stopped using the water for personal use. Bottled water was purchased or water *8 was carried from the purchasers' neighbors. The water condition fluctuated from day to day.
During these several months the purchasers were in constant contact with Henry Deraney, owner of Deran Sales, Inc. (water conditioning company). The problem baffled Deraney, and he took considerable interest in it. He tested the water continually and, like the purchasers, noticed considerable fluctuations in the quality of the water.
In March 1973 the vendors opened the petcock valve on the water conditioner and lit a match to the escaping air on a hunch by Deraney who suspected the presence of gas. The "air" ignited. It was later shown to be methane gas. Another valve was put on the water conditioner to prevent the gas from building up in the system.
The purchasers contacted local and state agencies in an effort to relieve these problems. Among the agencies contacted were the Bureau of Potable Water, State Department of Health, the local sanitarian and the local board of health. No one was able to solve the problem.
Deraney was baffled by the gas in the system and testified it was unique in his experience. His laboratory ran a number of tests on the water. The tests were interpreted by John Wilford, who was the Chief of Potable Water, Department of Environmental Protection. He was an expert in the area of potable water and was familiar with the water standards of New Jersey. After his tests he concluded that the water did not meet state standards. He found the water contained concentrations of impurities which rendered it hazardous to the health of the consumer and corrosive to the water supply system. It was his opinion that the water was not fit to drink or use.
Wilford sent a letter to Mine Hill Township on June 20, 1973 in which he said that the purchasers' water was not potable for aesthetic as well as chemical reasons. The condition was considered an emergency. After receiving the letter the township sent the purchasers a letter on July 19, 1973 which in part advised them that their water did not meet *9 the state potable standards and suggested some possible solutions to the problem. There was a suggestion of a hookup between the purchasers' house and a private water company, but the expense was $7,200. This was rejected by the purchasers as too costly. Moreover, the feasibility of such a project was never fully developed during the trial.
Relations between the parties deteriorated as the water difficulties increased. By May 1973 Mrs. McDonald told Mr. Mianecki that they did not want anything to do with him and to stay away because they had lost confidence in him. After May 15, 1973 there was no direct contact with the vendors.
The vendors claimed that after the gas was discovered the purchasers failed to cooperate with them; thus, while they were trying to solve purchasers' problem they were told to stay off the property. The vendors opined that the only reason the water situation was not corrected was because of the breach in communications.
The purchasers moved out of the house in September 1975. They had filed suit much earlier, and the matter was tried before a jury on the question of liability in January 1976. The jury found the vendors liable by reason of a breach of implied warranty of habitability. The jury rejected counts based on breach of contract and fraud.
The trial on damages followed immediately. Mr. McDonald testified that he had paid $45,342.62 for the house, which was encumbered by a mortgage of $35,000. He denied that he flatly rejected an offer to tie into vendors' well and testified that the proposal to tie into the private water company was too expensive. It was undisputed that there was no city water in the area. There was some discussion at town meetings that to extend water through purchasers' street would cost at least $6,000 a home plus tie-in charges. However, nothing concrete was proposed by the municipal officials.
Mr. McDonald acknowledged that he never asked the vendors to take the house back and testified that they offered to buy the home back for $50,000 on January 14, 1976. He *10 further testified he construed this offer to be in full settlement of his damage claims and therefore it was rejected. On the second day of trial, January 20, 1976, the purchasers sold the house for $35,000. The new buyer agreed to pay 50% of the delinquent taxes and mortgage payments in default. In accepting this offer the McDonalds were not precluded from continuing their damage claims against the vendors. Their claims were for the diminution of the value of the real property, damages to the personal property, as well as compensation for the inconvenience and interference with their normal living. Typical of the testimony concerning damages was the assertion that dishes, clothes, silverware and bedding were stained and ruined. They further claimed the dishwasher and clothes washer became inoperable due to the impurities in the water.
A real estate expert testified that without any water problems and resulting damage, the house would be worth $57,600. With the water problems, the house was worth $36,847. The jury returned a verdict in favor of the purchasers in the amount of $32,000.
In their argument on appeal the vendors make the following contentions of error:

 Point I  The court erroneously charged the jury on
 implied warranty of habitability.
 Point II  The court erroneously admitted into evidence
 the Deran water analysis.
 Point III  The court erred in the admission of the
 testimony of John Wilford.
 Point IV  The court erred in the admission into evidence
 of a letter from the Township of Mine Hill
 Board of Health.
 Point V  The jury verdict at the conclusion of the trial
 on liability was inconsistent and manifested a
 miscarriage of justice.
 Point VI  The court committed error in allowing the jury
 to consider the issue of methane gas.
 Point VII  The court committed error in submitting the
 diminished value of the real estate to the
 jury.
 Point VIII  The jury verdict should be reversed as being
 against the weight of the evidence.
*11 Point IX  The court erred in allowing prejudgment
 interest.
 Point X  Error committed below was plain error.

In disputing the purchasers' cause of action based on a breach of an implied warranty of habitability the vendors further contend that (1) a cause of action for a breach of implied warranty of habitability does not lie against a builder-vendor who is not a mass producer; (2) assuming there is a warranty, the judge erred in not giving a time frame for the warranty to operate in, and (3) the judge erred in not charging the jury that the defect must be shown to have existed when the house was constructed and sold.
The claim of a breach of implied warranty of habitability is based upon the allegation that the water supply is not potable. We deem potable water essential to habitability. In Elderkin v. Gaster, 447 Pa. 118, 288 A.2d 771 (Sup. Ct. 1972), the Supreme Court of Pennsylvania, in considering a similar problem, stated:
While we can adopt no set standard for determining habitability, it goes without saying that a potable water supply is essential to any functional living unit; without drinkable water, the house cannot be used for the purpose intended. * * * [288 A.2d at 777]
The traditional approach to a transaction such as the one under consideration is to view it as a sale of real estate "with appurtenances" which, upon acceptance of the deed, merges all prior contractual obligations not contained in the deed. Dieckman v. Walser, 114 N.J. Eq. 382 (E. & A. 1933); Campbell v. Heller, 36 N.J. Super. 361 (Ch. Div. 1955). The deed incorporates the usual language of the transfer of land, often accompanied by a metes and bounds description but with little, if any, recognition that it is conveying a habitable dwelling. Our law has paid scant attention to the underlying intention of the purchaser of a new home. Unfortunately, all too often the traditional rules of law governing the transfer of land ignore the primary intention of the purchaser, i.e., to obtain fit habitation. *12 Often the traditional principles of law are in conflict with the developing law of warranty or products liability. Although the conveyance of the land is an integral part of the transaction, the new house on the land is the most important part of the sale to the average buyer, notwithstanding the fact that the greater portion of our conveyancing law is the product of cases which deal with the exchange of title of land only.
The purchasers' theory has an attractive simplicity. Basically, they postulate that when they contract with a builder-vendor for a new house they reasonably expect good title to the land and a workmanlike construction of the house along with potable water fit for human consumption. If the water supplying the new house is not potable, the house is not fit for habitation, which the consumer feels is a reasonable warranty to imply from the transaction, notwithstanding the absence of an express provision to that effect in the deed.
In canvassing the case law throughout the country, it becomes obvious that a growing number of jurisdictions recognize that no public policy is promoted by relieving the builder-vendor of these implied warranties. In Tavares v. Horstman, 542 P.2d 1275 (1975), the Supreme Court of Wyoming was in the unique position of considering for the first time the application of the concept of caveat emptor in a real estate transaction. It was a question of first impression in the state. Having the advantage of being unencumbered by a principle of long standing, the court objectively reviewed the case law throughout the country and held that the rule of caveat emptor should not protect the builder-vendor. The doctrine was considered to be unrealistic in light of the modern marketplace, and the court held that implicit in the agreement was the understanding that the house was fit for habitation. In reaching this conclusion, the court recognized the sweeping changes that have occurred in the real estate market in a relatively short period of time.
*13 Since World War II homes have been built in tremendous numbers. There have come into being developer-builders operating on a large scale. Many firms and persons, large and small operators, hold themselves out as skilled in home construction and are in the business of building and selling to individual owners. Developers contract with builders to construct for resale. Building construction by modern methods is complex and intertwined with governmental codes and regulations. The ordinary home buyer is not in a position, by skill or training, to discover defects lurking in the plumbing, the electrical wiring, the structure itself, all of which is usually covered up and not open for inspection.
A home buyer should be able to place reliance on the builder or developer who sells him a new house. The improved real estate the average family buys gives it thoughtful pause not only because of the base price but the interest involved over a long period of time. This is usually the largest single purchase a family makes for a lifetime. Some may be able to pay cash but we cannot single out that buyer in the formulation of a rule.
It ought to be an implicit understanding of the parties that when an agreed price is paid that the home is reasonably fit for the purpose for which it is to be used  that it is reasonably fit for habitation. Illusory value is a poor substitute for quality. There is no need for the buyer to be subjected to the harassment caused by defects and he deserves the focus of the law and its concern. The significant purchase of a new home leads logically to the buyer's expectation that he be judicially protected. Any other result would be intolerable and unjust, as the cases which follow demonstrate. [at 1279]
After making an exhaustive review of the pertinent case law throughout the country, the Tavares court concluded:
The cases assessing liability to the vendor under an implied warranty or negligence, or both, continue to pile up. * * * [at 1281]
Moreover, our own independent survey of the case law indicates a growing number of jurisdictions have abandoned the traditional defense of merger or caveat emptor.
In Rothberg v. Olenik, 128 Vt. 295, 262 A.2d 461 (1970), the Supreme Court of Vermont, after reviewing a wealth of authority on the subject, held that the law will imply a warranty against structural defects and rejected the argument of the defense that there are sound reasons for retaining *14 the doctrine of caveat emptor. They reaffirmed their holding in Bolkum v. Staab, 133 Vt. 467, 346 A.2d 210 (Sup. Ct. 1975). Again they decided there was no rational doctrinal basis for differentiating between the sale of a newly constructed house by the builder and the sale of any personalty product. The court further held the doctrine applied notwithstanding that the vendor did not actually build the house himself but engaged a contractor for that purpose.
In Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (Sup. Ct. 1964), the walls of the new house began to crack within four months after taking title. The purchasers brought an action against the builder. The court upheld the purchasers' right to bottom their action in breach of express and implied warranties as well as fraud. The court stated:
We hold that the implied warranty doctrine is extended to include agreements between builder-vendors and purchasers for the sale of newly constructed buildings, completed at the time of contracting. There is an implied warranty that builder-vendors have complied with the building code of the area in which the structure is located. Where, as here, a home is the subject of sale, there are implied warranties that the home was built in workmanlike manner and is suitable for habitation. [388 P.2d at 402]
The same result was reached in a situation where the purchaser of a new house started to have trouble with water in the basement. In Crawley v. Terhune, 437 S.W.2d 743 (1969), the Court of Appeals of Kentucky held:
Because the caveat emptor rule is completely unrealistic and inequitable as applied in the case of the ordinarily inexperienced buyer of a new house from the professional builder-seller, and because a contract by the builder to sell a new house is not much distinguishable from a contract to build a house for another, we are disposed to adopt the minority view to the extent of holding that in the sale of a new dwelling by the builder there is an implied warranty that in its major structural features the dwelling was constructed in a workmanlike manner and using suitable materials.
*15 The instructions in the instant case substantially presented the theory of implied warranty above approved and the evidence supported the finding of a breach of such warranty. Accordingly, the recovery against Crawley was proper. [at 745]
In Vernali v. Centrella, 28 Conn. Super. 476, 266 A.2d 200 (Super. Ct. 1970), the court upheld a similar action by the purchaser of a house against a builder-vendor. It recognized an action based on a breach of an implied warranty that the construction would be in a workmanlike manner and suitable for the purpose intended.
The Supreme Court of Alabama changed a long standing rule in that state and held that the rule of caveat emptor does not apply in the sale by a builder-vendor of a newly constructed house. In so holding in Cochran v. Keeton, 287 Ala. 439, 252 S.2d 313 (1971), the court stated:
Considerable comment has been made by legal scholars about the new trend toward judicial abolition of the doctrine of caveat emptor in real estate sales. Most scholars question the retention of the rule in view of current day conditions.

* * *
* * * Some jurisdictions, however, still strictly apply the doctrine of caveat emptor but the trend appears definitely to be changing to the view we express here. See Annotation: Defective Home  Vendor's Liability, 25 A.L.R.3d 383. [287 Ala. at 441, 252 So.2d at 314-315]
Again, in Elderkin v. Gaster, supra, the Supreme Court of Pennsylvania made an extensive review of the authorities and concluded:
* * * As between the builder-vendor and the vendee, the position of the former, even though he exercises reasonable care, dictates that he bear the risk that a home which he has built will be functional and habitable in accordance with contemporary community standards. We thus hold that the builder-vendor impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for the purpose intended  habitation. [447 Pa. at 128, 288 A.2d at 777]
*16 In 1957 New Jersey followed the traditional approach when dealing with a builder-vendor  purchaser agreement. The doctrine of merger and its kindred principle caveat emptor applied.[1]Levy v. C. Young Construction Co., Inc., 46 N.J. Super. 293 (App. Div. 1957), aff'd on other grounds, 26 N.J. 330 (1958).
In Levy plaintiffs were suing the builder for a sewer line defect discovered three years after taking title to the property. Their claim was based on implied warranty. The court held that acceptance of a deed without covenants as to the construction cut off the builder-vendor's liability. It reasoned:
* * * Defendant contends that the acceptance of a deed by the purchaser from the vendor terminates the contractual relationship between the parties, and their respective rights and liabilities are thereafter determined solely by the deed and not by the contract of sale. This argument fairly summarizes prevailing law throughout the country. [Citations omitted]. Although the doctrine of caveat emptor, so far as personal property is concerned, is very nearly abolished, it still remains as a viable doctrine in full force in the law of real estate. Absent any covenant binding defendant to sell a well constructed house, plaintiffs cannot sue on an implied warranty. Williston, supra. That the rule of caveat emptor applies, and that there are no implied warranties in the sale of real estate, has been criticized, especially when applied to the sale of new housing [Citations omitted].
A builder who sells a completed house is thereafter not liable to the purchaser for damages resulting from latent defects in the absence *17 of express warranties in the deed or fraud or concealment. Neither fraud nor concealment is present here. * * * [46 N.J. Super. at 296-297]
In support of its holding, the court concluded with the following rationale:
As defendant notes, the policy reasons underlying the rule that the acceptance of a deed without covenants as to construction is the cut-off point so far as the vendor's liability is concerned, are rather obvious. Were plaintiffs successful under the facts presented to us, an element of uncertainty would pervade the entire real estate field. Real estate transactions would become chaotic if vendors were subjected to liability after they had parted with ownership and control of the premises. They could never be certain as to the limits or termination of their liability. * * * [Id. at 297-298]
In a strong dissent, Judge Waesche concluded by saying:
* * * I think that the implied representations on the part of the defendant that it possessed a reasonable amount of skill necessary for the erection of a house, and that the house was erected in a proper and reasonably workmanlike manner were collateral to the deed of conveyance and that such representations did not merge in said deed. [Id. at 299; citations omitted]
The Supreme Court affirmed the Appellate Division:
* * * but for reasons totally different from those relied upon by the Appellate Division. Whether the widely established rule followed below is harsh and inequitable and should be rejected, or whether it is sound and workable and should be adopted, is a question we are not called upon to decide in light of our view of the case sub judice. [26 N.J. at 334]
In 1961 the Supreme Court of Wisconsin considered a similar case. Fisher v. Simon, 15 Wis.2d 207, 112 N.W.2d 705 (1961). In defending a claim of negligent construction, defendant builder cited and relied on Levy v. C. Young Construction Co., Inc., supra. The Wisconsin court, after quoting the policy reasons the Levy court used in buttressing its decision, rejected the Levy reasoning and stated:
*18 We are wholly unconvinced by the policy reasons thus advanced by the court for its holding. It seems to us that the same reasoning applied in products liability cases would require that manufacturers of chattels not be held liable for negligently made articles. [Fisher v. Simon, supra, 112 N.W.2d at 710]
This court is also convinced that the policy reasons used in Levy to support the traditional doctrines of merger and caveat emptor are no longer viable. Our court in Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965), alluded to this in its disparagement of Levy and its approbation of Wisconsin's position in Fisher v. Simon, supra. In discussing Fisher and Levy, our Supreme Court said:
* * * In Levy there was a suggestion that real estate transactions would become chaotic if vendors were subjected to liability after they had parted with ownership and control of the premises. 46 N.J. Super., at p. 297. The Wisconsin court considered this reasoning to be wholly unconvincing, at least when applied to a builder vendor such as the defendant there or Levitt here; it properly noted that if the same reasoning were applied in products liability cases generally, manufacturers of chattels would not be held liable for negligently made articles and MacPherson would not be settled law. 112 N.W.2d, at p. 710; see 1963 Wis. L. Rev. 343. It is worthy of memtion that a dissenting judge in Levy would have held the defendant builder vendor liable for injuries resulting from breach of an implied representation that the house was constructed in a proper and reasonably workmanlike manner (46 N.J. Super., at p. 298) and that, on appeal, this Court explicitly declined to adopt any of the reasoning of the majority below but affirmed on the factual finding that no negligent or defective construction had been proved. 26 N.J., at p. 334. See 12 Rutgers L. Rev. 529 (1958); Pinsky, "Real Property," 15 Rutgers L. Rev. 276, 300 (1961). [at 85-86]
We are satisfied, under the circumstances of this case, that the law of merger or the doctrine of caveat emptor should not apply. Although decided only 20 years ago, Levy was decided in another context. We have the advantage of an additional 20 years perspective in viewing the tremendous increase in home construction and its impact on our present society. Moreover, we have also experienced the expansion and development of the comparable law of products *19 liability. We hold in a case such as this where a vendor-builder constructs a new house for the purpose of sale, the sale carries with it an implied warranty that it was constructed in a reasonably workmanlike manner and is fit for habitation. We further hold that the implied warranty survives the deed, although not expressly provided therein. As was said in Rothberg v. Olenik, supra, we see no "rationale doctrinal basis for differentiating between a sale of a newly constructed house by the builder-vendor and the sale of an automobile or any other manufactured product." (262 A.2d at 467).
Vendors argue that the cases of Dwyer v. Skyline Apartments, Inc., 123 N.J. Super. 48 (App. Div. 1973), aff'd o.b. 63 N.J. 577 (1973), and Conroy v. 10 Brewster Ave. Corp., 97 N.J. Super. 75 (App. Div. 1967), certif. den. 51 N.J. 276 (1968), militate against the purchasers of realty invoking the doctrine of implied warranty of habitability. We think not. Both of the aforementioned cases deal with landlord-tenant law as it pertains to actions for personal injuries. Neither is appropriate to the resolution of the issues involved in the instant case. Moreover, the statement in Conroy v. 10 Brewster Ave. Corp., supra, to the effect that the liability imposed on the builder would be limited to "mass developers," as held in Schipper v. Levitt & Sons, Inc., supra, was diluted to a great extent by our Supreme Court in Totten v. Gruzen, 52 N.J. 202 (1968), wherein the court, although admittedly not dealing with the doctrine of strict liability, stated:
We see no good reason why the negligence principles adopted in Schipper with respect to mass housing developers (44 N.J., at pp. 80-88) should not be applied to all builders and contractors and we now so hold. They are not to be relieved from liability merely because their work has been completed and accepted by the owner. * * * [at 210]
Although the court was referring to the count sounding in negligence it did go on to make this parenthetical remark:
*20 * * * (Since there is no claim in the instant case on the theory of strict liability in tort, we do not reach the question whether that doctrine as applied in Schipper with respect to mass developers should be equally applicable in other building situations.) [Id.]
In light of the court's language in Totten and the amount of time that has elapsed since Conroy, we do not hesitate to reconsider the matter. See also, O'Conner v. Abraham Altus, 67 N.J. 106, 119 (1975).
The vendors also claim the trial judge erred in not limiting the warranty to a specific time. The court in Tavares v. Horstman, supra, recognized that various components which go into the construction of a house may have different life expectancies, and under certain circumstances, the duration of liability under an implied warranty could be relevant. However, we have no problem in this case inasmuch as the difficulties with the water were present from the time of the construction and the question of potability was present within a few months of the passage of title. In addition, although the judge's charge failed to inform the jury that plaintiffs' burden was to establish "that the house was defective when constructed and sold," Schipper v. Levitt & Sons, Inc., supra, 44 N.J. at 92, the evidence was overwhelming that the water was defective at the time title passed as well as after the sale. The jury had a reasonable basis to conclude that the water was not potable when title passed even though the conditions fluctuated from day to day. The facts do not admit to any other conclusion. We consider the error, if any, harmless. State v. Macon, 57 N.J. 325 (1971).
It should be noted that this case is to be distinguished from cases where the liability of a builder-vendor is based on the theory that his concealment of, or failure to disclose, defects in the dwelling constitute actionable fraud or misrepresentation. Buyers have always been able to proceed on the theory of fraud when the facts permit. See generally, 37 Am. Jur.2d, Fraud and Deceit, §§ 108, 159; 55 Am. Jur., Vendor and Purchaser (1 ed. 1946), §§ 79, 80 at 85.
*21 We further note that several jurisdictions base the liability of the builder-vendor on theories of negligence and strict liability. We recognize the rationale of the doctrine of strict liability in tort has pertinency to the issue under consideration. The doctrine is not restricted to the case of injury to a human being. In dealing with the liability of a manufacturer to the ultimate consumer for a defective rug after the goods had passed through the hands of a distributor and retailer, Justice Francis, speaking for the entire court, stated:
As we have indicated, the strict liability in tort formulation of the nature of the manufacturer's burden to expected consumers of his product represents a sound solution to an evergrowing problem, and we accept it as applicable in this jurisdiction. * * * [Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 66 (1965)]
In addition, our court has seen fit to carry the concept of strict liability in tort into the realty field when dealing with mass builder-vendors whose defective house causes injuries after completion of work and acceptance by the owner. Schipper v. Levitt & Sons, Inc., supra.
However, in the case under consideration we need not concern ourselves with the question of whether Schipper should be extended to small, solitary builder-vendors[2] since we are involved with a direct action by the original purchasers against their builder. In this case there is privity of contract. The application of the Schipper holding to a small builder can await the appropriate case. The doctrine of strict liability was invoked in Patitucci v. Drelich, 153 N.J. Super. 177 (Law Div. 1977), when dealing with the developer of a subdivision. However, the record is not clear as to the extent of the development and the experience of the builder. We further note without comment that the State of California, *22 one of the acknowledged leaders in the building boom of the last 25 years, has so far ruled out strict liability as the basis for an action by an owner against the builder for damages sustained as a result of constructing the house on unstable ground. Conolley v. Bull, 258 Cal. App.2d 183, 65 Cal. Rptr. 689 (D. Ct. App. 1968).
The vendors further assert the trial judge erred with respect to several rulings on the admissibility of evidence. We disagree. The test results of the Deran Laboratory with respect to the water were admissible into evidence as business records under Evid. R. 63(13). Mahoney v. Minsky, 39 N.J. 208 (1963); State v. Martorelli, 136 N.J. Super. 449 (App. Div. 1975), certif. den. 69 N.J. 445 (1976); Carroll v. Houtz, 93 N.J. Super. 215 (App. Div. 1966); Webber v. McCormick, 63 N.J. Super. 409 (App. Div. 1960). Furthermore, we find no basis to support appellants' contention that the court erred in admitting the expert testimony of John Wilford. The vendors' attorney was given the opportunity to confer with Wilford and did so. The judge also offered the vendors time to retain their own expert. This offer was declined. We find no abuse of discretion on the part of the trial judge in allowing this testimony. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 411 (1960).
The admission into evidence of the letter from the Township of Mine Hill Board of Health, if error, was harmless error. State v. Macon, supra. In addition to the letter, Henry Witt, a member of the Board of Health testified. Witt was in part responsible for the letter, and the vendors had an ample opportunity to examine him regarding the circumstances surrounding the drafting of the letter. Secondly, the subject matter of the letter was cumulative. It simply reiterated Wilford's testimony. Witt testified that the letter was sent as a result of pressure exerted by Wilford. The vendors were not prejudiced by the admission of this letter.
It is also alleged that the purchasers had the burden of "establishing to the jury's satisfaction from all the circumstances that the design was unreasonably dangerous and *23 proximately caused the injury." Schipper v. Levitt & Sons, Inc., supra, 44 N.J. at 96. This argument is not relevant to the facts of this case. The defect here was not an unreasonably dangerous design but rather defective water resulting in a breach of the warranty of habitability. There was no error.
The next contention alleges the jury verdict is inconsistent in finding the vendors liable while returning a verdict of "no cause for action" in favor of Deran Sales, Inc. We again disagree. There is no inconsistency here. The respective duties of the parties were different. The vendors' duty under the implied warranty was to deliver potable water to purchasers. Deran Sales, Inc.'s duty to the vendors was to provide a system to eliminate the excess iron in the water. Deran Sales, Inc. denied ever guaranteeing potable water, although the vendors claimed otherwise. Deraney testified that due to other mineral concentrations in the water that he was not told about, the iron could not be eliminated. The jury could have concluded that Deran Sales, Inc.'s system was fit for the purposes it was intended and only failed due to the other conditions of the water over which Deran Sales, Inc. had no control.
The vendors' allegations of error with respect to the damage phase of the case are limited to three contentions: (1) the judge erroneously allowed the jury to consider the existence of methane gas as a reason for the purchasers' refusal to drink the water; (2) the testimony of the diminished value of the property by the purchasers' expert was "at best, very weak * * *," and (3) the purchasers' failure to mitigate damages resulted in a verdict that was against the weight of the evidence.
We disagree with these contentions and find no reversible error. Unfortunately, like many of the vendors' other contentions, little or no authority is cited in support of the arguments. The methane gas argument is based on the assumption that the trial judge was correct in ruling that the gas could not be considered in a liability determination. We question this. The State's standards in evidence indicate *24 that water can be considered unpotable for aesthetic reasons. The trial judge reasoned that there was no proof that methane gas was harmful to the water. The ruling appears to ignore the aesthetic standard. We think the evidence of the presence of methane gas in the water and its odor was admissible in determining damages. Moreover, it is not beyond the ken of a jury to appreciate the presence of methane gas in water may make it undrinkable. In any event, it played such a small part in the proof of damages that it was not capable of producing an unjust result. State v. Macon, supra.
The evidence of diminution of value of the real estate was properly considered by the jury. The contention that the evidence could not be considered with respect to the breach of warranty claim is without merit. A standard measure of damage for a breach of warranty, a contract action, is diminution in value. Somerville, etc., Sales, Inc. v. General Metal Corp., 39 N.J. Super. 348, 359, mod. at rehearing, 39 N.J. Super. 562 (App. Div. 1956); N.J.S.A. 12A:2-714(2). Furthermore, evaluation of the quality and credibility of Schieke's testimony, the purchasers' real estate expert, was a function of the jury.
The vendor's last damage allegation is that the jury verdict should be reversed on the issue of damages as being against the weight of the evidence. More specifically, the vendors contend that the jury did not consider the purchasers' failure to mitigate damages.
The duty of a litigant to mitigate damages is firmly entrenched in our law. McGraw v. Johnson, 42 N.J. Super. 267, 273 (App. Div. 1956). In Bates v. Warrick, 77 N.J.L. 387 (Sup. Ct. 1909), it was held that the cost of the repairs was evidence of depreciation and value. However, in the instant case there was a substantial basis for the jury to reject alternatives which the vendors allege would have mitigated damage. The expenditure of $7,200 for a hookup with the Hedden Water Company was tentative and could have been reasonably rejected by the jury. Although there was testimony *25 concerning the expenditure of $6,000 as a local assessment for the installation of city water on the purchasers' street, the municipality never did enact an ordinance to that effect. Other proposals suggested in the testimony could have been reasonably discounted by the jury as being impractical resolutions of the purchasers' problems. Moreover, the eleventh hour offer by the vendors could have been construed, as alleged by the McDonalds, as an attempt to settle all of the purchasers' claims in the law suit. The jury could have properly determined that the $50,000 did not represent the value of the property but rather the vendors' offer to settle all claims, particularly where there was evidence that the value of the property in a habitable condition would have exceeded the offer that was made.
The jury heard both sides of the story. There was conflicting testimony. The purchasers testified they attempted to mitigate their damages. There is no cause to overturn the verdict because the vendors believe the jury should have accepted their testimony as more credible. A verdict should not be overturned simply because the jury might have rationally decided otherwise. If competent evidence supports the jury's verdict, as was the case herein, an appellate tribunal will not disturb that finding. Barber v. Vaccaro, 32 N.J. Super. 573, 577-578 (App. Div. 1954), certif. den. 17 N.J. 523 (1955).
We have determined that the purchasers' cause of action is based on a breach of implied warranty arising out of their agreement. The vendors now allege that the judge erred in allowing prejudgment interest in such an action sounded in contract. We agree.
R. 4:42-11(b) reads as follows:
Except where provided by statute with respect to a public entity or employee, the court shall, in tort actions, including products liability actions, include in the judgment simple interest at 8% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. * * * [Emphasis supplied]
*26 The rule clearly refers to a tort action, and we see no basis to broaden the express language of the rule. The judgment will be modified by excluding prejudgment interest.
The vendors' final salvo simply alleges "error committed below was plain error." As we understand this allegation, the vendors would have us comb this 2,000-page record and evaluate for plain error. R. 2:10-2. Such an approach is extremely unfair to both the purchasers and the court and, as a matter of fact, is improper. State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977). Suffice it to say, other than what has already been said, we have detected no legal impropriety which prejudicially effects the rights of the vendors and is sufficiently grievous to convince us that it is the type of error possessed of a clear capacity to bring about an unjust result. State v. Macon, supra; State v. Hock, 54 N.J. 526, 538 (1969).
Affirmed and modified.
NOTES
[1] We note the tendency in the case law throughout the country to use these terms interchangeably. Merger normally applies to real estate transactions and holds that all warranties and representations in connection with a sale made prior to or contemporaneous with a deed are merged into the deed, and unless expressly provided for in the deed, no longer exist. Restatement, Contracts, § 413 (1932).

The common law doctrine of caveat emptor applies to both real and personal property and provides that in the absence of fraud or misrepresentation a vendor is responsible for the quality of the property being sold or conveyed by him only to the extent for which he expressly agrees to be responsible. 7 Williston, Contracts (3 ed. 1963). § 926 at 779.
[2] It appears uncontradicted that defendant Joseph Mianecki built houses on a part-time basis and constructed two houses prior to the property in question.