458 A.2d 555

Steven GADBOIS and Judith A. Gadbois, Appellants,

v.

LEB–CO BUILDERS, INC.

v.

BETHEL TOWNSHIP, Appellant.

Larry P. FOX and Glenda M. Kreiser, Appellants,

v.

LEB–CO BUILDERS, INC.

v.

BETHEL TOWNSHIP, Appellant.

Superior Court of Pennsylvania.

Argued May 4, 1982.

Filed March 25, 1983.

Petition for Allowance of Appeal Granted Sept. 2, 1983.

George E. Christianson, Lebanon, for appellants (at Nos. 2454 and 2455) and for appellees (at Nos. 2507 and 2508).

Frederick S. Wolf, Lebanon, for Leb-Co, appellee.

Thomas S. Long, Lebanon, for appellants (at Nos. 2507 and 2508) and for appellees (at Nos. 2454 and 2455).

Before SPAETH, ROWLEY and CIRILLO, JJ.

SPAETH, Judge:

This case arises on four appeals, which have been consolidated.[1] Two of the appeals are by plaintiffs below. They argue that the lower court, sitting *en banc*, erred in granting exceptions to the trial court's method of calculating damages for defective construction of their sewage disposal systems. The third and fourth appeals are cross-appeals by the additional defendant. They argue that the lower court erred in holding it liable for any damages. We hold that the lower court properly held the additional defendant liable, but that it wrongly decided the issue of the measure of damages. We therefore reverse and remand with instructions to reinstate the verdicts returned by the trial court.

In the summer of 1978 appellants, Larry Fox and Glenda Kreiser and Steven and Judith Gadbois, purchased new houses from appellee, Leb-Co Builders. Soon after they moved in it became apparent that the sewer disposal systems didn't work, and raw sewage began to back up into their basements. When Leb-Co failed to fix the systems, appellants Fox and Kreiser and the Gadboises each brought an action against Leb-Co, alleging breach of an implied warranty of habitability and negligence. In each action Leb-Co joined Bethel Township as an additional defendant, alleging that the township had been negligent in issuing the sewer permits, inspecting the systems, and approving them.

The trial court, sitting without a jury, found in favor of appellants in both actions against both Leb-Co and Bethel Township, and awarded damages that included awards of $18,800 to Fox and Kreiser and $17,600 to the Gadboises. These amounts represented the "loss of value" to appellants' properties, that is, the difference between the respective values of appellants' properties with and without a properly functioning sewer system. The court *en banc* dismissed Leb-Co's and the township's exceptions as to liability but granted their exceptions as to damages. It held that the measure of damages should be the cost of repair-

1. These appeals have been before this court before. *See* 290 Pa.Super. 523, 434 A.2d 1267 (1981).

ing the sewer systems, and that this cost was, as to both properties, $2,750.

The opinion filed by the court *en banc* adequately disposes of the issue of liability. *See also Evans v. Otis Elevator Co.*, 403 Pa. 13, 18, 168 A.2d 573, 576 (1961) ("a party to a contract [ ] may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such a manner that third persons—strangers to the contract—will not be injured thereby"). The only issue that needs to be discussed is the issue of the proper measure of damages.

1

The lower court, sitting *en banc*, held that the measure of damages is " 'the difference in market value of the house as warranted and as built, or, *where the purchaser remains in possession*, the reasonable cost to repair,' " Slip op. of lower ct. at 4 (court's emphasis). In support of this proposition, the lower court cited only a law review case note, *"Elderkin v. Gaster*—The Pennsylvania Experience with Implied Warranties in Sales of New Homes," 47 Temp.L.Q. 172, 179–80 (1973). The three cases cited in the case note in support of the proposition include one Pennsylvania case, *Raab v. Beatty*, 96 Pa.Super. 574 (1929).[2] *Raab*, however,

**2.** Neither of the other two cases cited by the law review case note holds or says in *dictum* that the proper measure of damages, when the purchaser remains in possession, is *necessarily* the reasonable cost of repairs. In *Glisan v. Smolenske*, 153 Colo. 274, 387 P.2d 260 (1963), the Colorado Supreme Court said:

*Ordinarily,* the measure of damages recoverable for a breach of warranty is the difference between the actual value of the property at the time of sale and what its value would have been if it had been as warranted. But where the buyer has retained the property and uses it, as here, he *may* make reasonable expenditures to bring the property into conformity with the warranty, and such expenditures *may* represent the measure of the buyer's damages—another way of arriving at this difference in value.

387 P.2d at 263, 153 Colo. at 281. (Citations omitted; emphasis added).

In *Smith v. Old Warson Development Company*, 479 S.W.2d 795 (Mo.1972) *(en banc)*, the Missouri Supreme Court said:

The test is, of course, 'reasonableness' and that is essentially a fact issue for the jury. Plaintiffs presented evidence that the decrease in

.does not support but rather contradicts the proposition. First, in *Raab* this court did not make the measure of damages depend upon whether the purchaser remained in possession. Nothing was made to turn upon the fact of possession or not; in fact it is unclear from our statement of the case whether the plaintiff had remained in possession, although in the cases cited this was apparently so. Second, in *Raab* we did not affirm an award of the reasonable cost of repairs. Quite the contrary, we affirmed an award of the difference in market value. The award was $2,168; the testimony was that the market value of the house without any defects was "somewhere around" $9,300, but as constructed, was $7,000. 96 Pa.Super at 580.

Here, the damages awarded by the trial court—as distinguished from the court *en banc*—were consistent with *Raab*. With respect to the Fox/Kreiser property, an expert witness testified that with an adequate septic system, the market value was $48,800, without such a system, $30,000; the award was $18,800. With respect to the Gadbois property, the comparable figures were $47,600 and $30,000; the award was $17,600. R.R. at 125a–127a.

2

In considering what is the proper measure of damages, we may start with the observation that it is hard to imagine why the measure of damages should depend on whether the owner remains in possession. When people move into a new house, to find the foundation cracking and subsiding, or, as here, the septic system so defective that raw sewage backs up into the basement, their remaining in possession may be attributable to their inability to buy or rent a second house until they first sell their defective house, which they can't do because it is unsalable. That is what happened

value of the house because of the defect was $13,500. [ ] There was evidence that $6,000 would be required to remedy the defect, and there was considerable testimony and photograph evidence of the condition of the premises as a result of the defect. [ ] There was sufficient evidence to entitle a jury to find a lack of reasonable quality and fitness.
479 S.W.2d at 800.

here. Mrs. Gadbois's uncontradicted testimony was as follows:

Q. Mrs. Gadbois, have you and your family continued to reside in this home.

A. Yes. We have no other choice.

Q. When you say you have no other choice, what do you mean by that?

A. Well, there is no other place to live. We have to keep on paying our mortgage on this property, and we can't sell it because the title is stamped unmarketable, and nobody would buy a piece of property like that, and we are stuck with it.

R.R. at 58a–59a.

Mr. Fox testified to the same effect:

Q. Mr. Fox, you have continued to live in this property, even though it does not have a functional septic system. Will you indicate why you have not moved to other quarters?

A. Well, we had no other choice, really. We couldn't afford to pay for two properties. It was just financial, really—I mean, we just couldn't move to somewhere else. We had to stick it out.

Q. Is it habitable?

A. Not in my opinion.

R.R. at 103a–104a.

Consistent with such practical considerations, a substantial body of case law ignores the distinction between possessing and non-possessing homeowners and allows damages for defective housing measured by the loss of value due to the defects. *Kriegler v. Eichler Homes, Inc.*, 269 Cal.App.2d 224, 74 Cal.Rptr. 749 (1969) (Builder liable to home buyer for diminution in value of house as result of installation of defective heating system); *McDonald v. Mianecki*, 159 N.J.Super. 1, 386 A.2d 1325 (1978) (Standard measure of damages for breach of implied warranty of habitability by builder of new house, arising out of unfitness of drinking water, is diminution of value of real

estate); *Kenney v. Abraham,* 119 Wash. 167, 90 P.2d 713 (1939) (Difference between value of house as constructed and value as it should have been constructed is proper measure of damages for contractor's failure of substantial performance). In one of these cases, which is virtually identical on its facts to the present case, the Washington Supreme Court awarded damages measured by the difference in value. *Hoye v. Century Builders,* 52 Wash.2d 830, 329 P.2d 474 (1958). Said the court:

There remains for consideration the correct measure of damage. The difference in value rule is proper in a building contract if there has not been substantial performance. It hardly requires demonstration that there is no substantial performance if the house, when completed is unfit for human habitation by reason of the discharge of raw sewage, which condition stubbornly resists correction. *White v. Mitchell, supra; Forrester v. Craddock,* 51 Wash.2d 315, 317 P.2d 1077; *Kenney v. Abraham,* 199 Wash. 167, 90 P.2d 713; *Eckhardt v. Harder,* 160 Wash. 207, 294 P. 981.

329 P.2d at 477, 52 Wash.2d at 835.

Some courts have recognized alternative measures, without, however, specifying a criterion for decision. *Parsons v. Beaulieu,* Me., 429 A.2d 214 (1981) ("Damages for defective [septic system installation in new house] may be measured either by the difference in value between the value of the performance contracted for and the value of the performance actually rendered, or by the amount reasonably required to remedy the defect."). Other courts, however, have gone further, specifying a criterion. Thus it has been held that where repairs are reasonably practical, the proper measure of damages is the cost of repairs, *Moore v. Werner,* 417 S.W.2d 918, 920 (Tex.Civ.App.1967) ("It is well-established that the measure of damages for construction defects which can be remedied without impairing the building as a whole is the reasonable cost of remedying the defects."), but where repairs are not reasonably practical, the measure of damages is the difference in market value,

*Farney v. Bestfield Builders,* Del.Super., 391 A.2d 212 (1978) (Where contractor fails to perform according to contract, by reason of removing trees from building lot, plaintiff is entitled to damages measured by amount required to remedy defective performance unless it is not reasonable or practical to do so; diminution in market value is then alternative measure of damages). A corollary of this principle is that where the cost of repairs exceeds the difference in market value, the proper measure of damages is the difference in market value. *Levesque v. D. & M. Builders, Inc.,* 170 Conn. 177, 365 A.2d 1216, 1218 (1976) (Where defendant builder constructs house too close to edge of lot, plaintiff's damages should be diminished value of building by reason of defects; market value measure used to avoid economic waste in relocating house); *Brewer v. Custom Builders Corp.,* 42 Ill.App.3d 668, 1 Ill.Dec. 377, 356 N.E.2d 565 (1976) (Where correction of defects in construction of shell of house would require substantial tearing down and rebuilding, measure of damages is difference in value between work as performed and as it should have been performed); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966) ("Major defects which render the house unfit for habitation, and which are not readily remediable, entitle buyer to rescission and restitution."). The reasoning of these cases is in accord with the Restatement of Contracts, which long ago took the position that the purchaser is entitled to damages for either

   (i)  the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

   (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste.

Restatement, Contracts § 346 (1932). *Accord,* Restatement, Second, Contracts § 347, comments *a* and *b.*

Pennsylvania has likewise adopted the view that damages for the breach of a construction contract may be measured by the diminution in value. Thus we said in *Brourman v. Bova*, 198 Pa.Super. 279, 182 A.2d 245 (1962), that "[t]he measure of damages in matters of this nature [a contract for the repair of, and the construction of an addition to, a house], as a general rule, is the difference in value between what is tendered as performance and what is due as performance under the contract, and this may consist of the amount required to remedy the defect." *Id.*, 198 Pa.Superior at 281, 182 A.2d at 246 (citations omitted).

■ We think we should somewhat modify our statement in *Brourman*—should slightly refocus or sharpen it—and hold that the measure of damages in cases where a homeowner sues for defective construction is the difference between the market value of the house as constructed and the market value that the house would have had if constructed as promised, with the qualification that if it is reasonably practical to cure the defects in construction by repairs, and if the cost of repairs does not exceed the difference in market value, then the measure of damages is the cost of repairs.

3

■ As already mentioned, here the damages awarded at trial were the difference between the market value of the property as constructed (Fox/Kreiser: $30,000; Gadbois: $30,000) and the market value of the property if it had been constructed with an adequate septic system (Fox/Kreiser: $48,000; Gadbois: $47,600). The verdicts were therefore $18,800 and $17,600. The lower court, sitting *en banc*, modified these verdicts, stating that "on the basis of evidence adduced each set of plaintiffs will be awarded, as loss of value, the amount of $2,750.00." Slip op. at 4. This was error, and the original verdicts will be reinstated.

To begin, it should be noted that it cannot be determined with certainty what measure of damages the court *en banc* was applying when it modified the verdicts. As just noted,

in the sentence announcing its conclusion to modify, the court stated that it was awarding as damages the "loss of value." However, nothing supports a finding that $2,750 represented "loss of value." The phrase "loss of value" would seem necessarily to refer to "loss of *market* value," for no other sort of value would seem relevant, and as to loss of market value the evidence is clear: it was $18,800 for the Fox/Kreiser property and $17,600 for the Gadbois property. It seems likely, however, that despite its reference to "loss of value," the court meant to refer to "cost of repairs." In the two paragraphs immediately preceding its reference to "loss of value," the court said:

> Generally, the difference in the value of the home as built and its value as warranted is awarded if repair is not economically feasible. There is no question that repairs are feasible in this instance. The question is how much the repairs will cost....
>
> There was testimony evidenced by defendant Leb-Co through an engineer, W.B. Kassees, that the construction of a conventional subsurface sewage disposal system with septic tank would remedy the current defects on both lots. The approximate cost would be $2,000. Other testimony established the cost of emptying a holding tank, showed that measures be found feasible as a correction would be $100.00 monthly.
>
> Slip op. at 4.

And immediately after its statement that damages "will be awarded, as loss of value, [in] the amount of $2,750.00," the court said:

> It is our judgment the sum is consistent with the estimate of "$2,000.00, plus or minus" given by Mr. Kassees, and an allowance for inflationary factors.
>
> Slip op. at 4–5.

If indeed the record did show that it is reasonably practical to cure the defects in construction at a cost of $2,750, we should affirm the court *en banc's* order. For then, despite what we find to be ambiguities in its opinion, the court would nevertheless in fact have applied the proper

measure of damages: the lesser of the figure representing the difference in market value and the figure representing the cost of repairs. The difficulty is that the record does *not* show that it is reasonably practical to cure the defects in construction, either at a cost of $2,750 or at any other cost.

The court *en banc* based its statement that "repairs are feasible" on "testimony ... by defendant Leb-Co through an engineer, W.B. Kassees ...." Slip op. at 4. Mr. Kassees's testimony may be summarized as follows. It was he who approved of the plans for the sewage system. N.T. 110. When asked whether the system was installed in accordance with the plans, he answered, "It was not." *Id.* Subsequent to the installation, he was asked "to review this situation," and he did, "at the job site." N.T. 110–11. He didn't recall when he went to the site, but it was "[p]ossibly February of '79." N.T. 102. After examining the problem at the site, he did *not* design a system that would correct it. Instead, he "recommended a procedure for testing to determine whether the soil can take at other locations, can take the sewage." N.T. 102. The tests he recommended were performed on one of the properties—he "could not recall whether it would be Gadbois or Fox." N.T. 103. [Apparently it was for the Fox property.] He then recommended that *if that would work,* then a septic bed could be installed in that area where it did show evidence of working." N.T. 104 (emphasis added). When asked, "Would the system you had recommended as a repair system for Fox's property also be a potential repair system for the Gadbois' property?" he answered: "I don't recall the reports from the Matthew-Heckley personnel [who did the testing], but *I believe* they were positive in the same way. *I don't recall.*" N.T. 106 (emphasis added). When asked whether he "thought [his recommendation] would be a solution to the problem," he answered, "I felt it would be, yes." N.T. 105. When asked "the approximate cost," he answered, "I would say you are talking about a couple of thousand dollars, approximately," going on to agree that he was "saying two

thousand dollars plus or minus." N.T. 107. He acknowledged, however, that one "Gordie Sheetz," representing Bethel Township, had told him that the changes he had recommended could not be made because they would not be approved by the township without further testing being done. N.T. 104, 107. He further acknowledged that the further testing required by Mr. Sheetz had not been done, by him or by anyone retained by him. N.T. 107–08.

Mr. Sheetz also testified. He said that he was employed by the Lebanon County Planning Department as on-lot sewage administrator, and that he was certified by the Department of Environmental Resources as a sewage enforcement officer. N.T. 205–06. He also said that it was his agency's duty to enforce the sewage regulations in Bethel Township. N.T. 206. In response to a question from the trial judge, Mr. Sheetz said that "[t]he original [sewage] system [on the Fox/Kreiser and Gadbois properties] did not work at all," adding "... I know of no way of rehabilitating the original system that was installed ...." N.T. 220. When asked, "[D]o you feel that a system could be designed to solve the problem?" he answered, "I can't answer that at this point without—you know—further testing be[ing] done." N.T. 222. When asked whether "the repair system designed by Matthew & Heckley [i.e., the recommendation made by Mr. Kassees] is a possible solution to the problem—the sewage problem?" he answered, "At this point, I couldn't say either way," and went on to refer to two letters he had written to the property owners stating "that further testing should be conducted ...." N.T. 209. And finally, he confirmed that he did not, and would not, approve the recommendation of Mr. Kassees:

Q. Did you discuss with anyone the possibility of installing the corrective system to see if it would work?

A. I wasn't in a position to issue a repair permit at that time. There were too many things that were unanswered. Acting as a sewage officer for the township, I would not issue ....

N.T. 216.

In short: What the record shows is this:

First, that the sewage system was improperly installed and doesn't work;

Second, that on the basis of tests conducted on one of the two properties in question, repairs were recommended that Mr. Kassees "felt" would work and that would cost approximately $2,000;

Third, that whether those repairs *would* work has never been established, because Mr. Sheetz, representing the county, the township, and the Department of Environmental Resources, was not satisfied they would, and refused to issue a permit for them to be done on the ground that further testing was required; and

Finally, that further testing has not been done.

Given this record, it is abundantly clear why the trial court measured damages by the difference in market value. The statement by the court *en banc* that "repairs are feasible" is unwarranted. What repairs? Not those recommended by Mr. Kassees. They're not feasible because Mr. Sheetz won't permit them. And Mr. Sheetz hasn't recommended *any* repairs, nor will he approve any until further testing has satisfied him of their feasibility.

### 4

■ Both Bethel Township and Leb-Co argue that appellants are to blame because *they* have failed to correct, or, by further testing, to try to correct, the sewer systems. The lower court properly rejected this argument, finding that appellants, "non-experts in the field, did everything required of them to mitigate their damages," Slip op. at 7, and that

[t]he testimony established that Leb-Co did nothing concrete to remedy the situation. An agent of Bethel issued the sewage permit. Moreover, Bethel reviewed the de-

sign of the lot and inspected the system. Both Leb-Co and Bethel had consultations regarding corrections (N.T. 130, 131). Furthermore a representative of Bethel told Leb-Co not to continue their work on the properties N.T. 40. The testimony is replete with instances of Bethel's and Leb-Co's failures to correct the malfunction to the misery of plaintiffs.

*Id.* at 8.

The record shows that after the defects in the septic systems first appeared, Leb-Co pumped out appellants' basements, but then refused to continue to do so. R.R. at 47a–48a, 90a. Mrs. Gadbois testified that after sewage backed up into her basement a second time, a Leb-Co representative informed her "that he could not keep on paying to have the septic system pumped out at his expense, and what did I expect for the price of the house." R.R. at 48a. After the initial pumping out, virtually the only measure Leb-Co took to remedy the continuing problem was to dig pits in appellants' yards to act as reservoirs for sewage coming from the houses. Mrs. Gadbois described the pit dug in her yard as "one massive hole, and it's big enough to park three cars in. It's about twenty feet long and maybe ten feet deep, and about ten feet wide." R.R. at 51a. These pits have remained open since February 1979. *Id.* They are full of raw sewage, maggots, and water; children have fallen into them while playing. R.R. at 55a–56a, 73a.

For appellees to argue that it was up to appellants to find a workable solution to the defective septic systems is like saying that a manufacturer may guarantee a product if the consumer will find a way to make it work.

The order of the court *en banc* is reversed and the case remanded with instructions to reinstate the verdicts returned by the trial court.

Jurisdiction is relinquished.