**In re GORDON URMSON BUILDER & SONS, INC., Debtor.**

**William Pineo, Trustee, Plaintiff,**

**v.**

**Richard M. Smaltz and Linda Smaltz, His Wife; and First Western Bank, Now by Merger Sky Bank, Defendants.**

**Bankruptcy No. 97–11917.
Adversary No. 01–1049.**

United States Bankruptcy Court,
W.D. Pennsylvania.

July 16, 2003.

**548**

William Pineo, Esq., Meadville, PA, Trustee.

W. John Knox, Esq., Erie, PA, for Trustee.

P. Raymond Bartholomew, Esq., Hermitage, PA, for Richard M. Smaltz and Linda Smaltz.

Richard J. Parks, Erie, PA, for Sky Bank.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Gordon Urmson Builder & Sons, Inc. ("Debtor") filed a voluntary Petition under Chapter 7 of the Bankruptcy Code on December 19, 1997. William Pineo was appointed and serves as Chapter 7 Trustee ("Trustee"). Listed as an asset on Debtor's Schedule B, Personal Property, is an account receivable due from Richard M. and Linda Smaltz (the "Smaltzes") in the amount of $67,436.37.

The Trustee filed the within Complaint for Turnover of Money or Property ("Complaint") to collect the receivable from the Smaltzes, and against First Western Bank, now by merger Sky Bank ("Bank") on the theory that the Debtor was a third party to the construction loan agreement between the Smaltzes and the Bank. Smaltzes filed an Answer and Counterclaim and the Bank filed an Answer and Statement of Defenses. After the Bank's Motion for Summary Judgment was refused and prior to the commencement of trial, the Trustee and the Bank agreed to a settlement of the issues between them. A three-day trial was held on December 18, 19, and 20, 2002 on the Trustee's Complaint against the Smaltzes and on the Smaltzes' Counterclaims.

Post-trial argument was heard on December 30, 2002. By Order dated April 23, 2003, a net judgment in the amount of $33,550 was entered in favor of the Trustee on the Trustee's Complaint and on the Smaltzes' Counterclaims. The Smaltzes filed a timely Notice of Appeal on May 2, 2003. We write to amplify upon the basis for our decision.

### Facts

Gordon Urmson started Gordon Urmson Builders as a proprietorship in 1953. The Debtor operated as a corporation for 6 or 7 years prior to the bankruptcy filing. The principals of the Debtor were Gordon Urmson and his two sons-in-law, Robert Schaller ("Schaller") and Randy Carnino.

Schaller and the Smaltzes were longtime friends. In Spring, 1996, Schaller built some studio sets for the Smaltzes' photography studio. Pleased with that work, the Smaltzes discussed with Schaller the possibility of building a house in the Fall of 1996. Schaller advised the Smaltzes to obtain a set of plans for review. Mr. Smaltz later presented a set of plans that he drew up himself. The drawings were incomplete but Schaller was able to use them to provide the Smaltzes with a ballpark figure of $269,000 for the cost of construction.

The Smaltzes then obtained further plans that were also incomplete, but provided enough information for Schaller to

---

1. The within Opinion constitutes this Court's findings of fact and conclusions of law.

prepare a bid. Schaller and Mr. Smaltz addressed certain details and agreed that other details could be reserved for later determination. The Debtor submitted a bid of $229,550. The usual cost for construction of a brick house of this type was $85 per square foot. The quote of $68/69 per square foot provided the Smaltzes a significant price break.

On August 1, 1996, Debtor and the Smaltzes executed a contract under which the Debtor agreed to construct a residence for the Smaltzes for the sum of $229,550 (the "Contract"). The Smaltzes signed a loan agreement for a construction loan from the Bank on September 17, 1996 (the "Loan Agreement"). The Loan Agreement provides a schedule for progress payments and provides that the construction will be completed within 6 months. Even though the completion date according to the Bank's schedule was March, 1996, the parties initially agreed on a completion date of May 1, 1997 and later agreed to a completion date of July 31, 1997.

Work commenced in September, 1996. Details in the Contract were incomplete, but Schaller and the Smaltzes believed that they had sufficient information to begin and that, as friends, they would work out the details during the construction process. The plans were incomplete. Mr. Smaltz didn't want to pay the architect to finalize the plans. Mr. Smaltz was incompetent as an architect. Schaller tried to utilize the partial plans in an effort to save his friend some money.

Prior to work on the foundation, Schaller spent time putting measurements on the foundation plan. While this was pointed out in the testimony as a source of delay, it was not considered a significant delay at the time.

The Contract called for a basement with 13 courses of block per the Smaltzes' request. After the masonry contractor had laid part of the 13th course of block, the Smaltzes determined that 13 courses was too high and elected to remove the top course. Mr. Smaltz removed the partially completed 13th course over a weekend. This is pointed out as an example of the many changes made by the Smaltzes and a cause of delay. This change was memorialized in a change order dated October 21, 1996 which provides:

the removal of 13th course of block done by homeowner and the brickledge add to left side of house and new slate tiles N/C

the owner agrees to let us put proper grade up on the brick to get proper slope

Elimination of the 13th course of block was not considered a material event at the time. The only concern was grading which the parties agreed would be solved by allowing the Debtor to place dirt upon brick to obtain the proper grade.

Other changes were made at this early stage per the October 21 change order: extra foundation and drains for center wall, stove and fireplace; block and labor, lintels and rebar for center wall, stove and fireplace; the foundation was changed to provide for an enlarged sun porch.

Additional changes are referenced on change orders dated November 5 and November 19, 1996. While these changes may have been frustrating for the workmen, and certainly contributed to delay, this was nothing more than Schaller and the Smaltzes anticipated. This was part of the plan that the friends would work together to provide the best house at the best possible price.

The house was to have been bricked by November 28, 1996. The Smaltzes wanted bricking completed before harsh winter weather required inclusion of calcium or antifreeze in the cement to prevent freezing.

The brickwork was not complete by November 28. Schaller now blames the delay on the number of changes made by the Smaltzes. The Smaltzes now blame the delay on the Debtor's doing too many jobs at once and the failure to properly oversee its employees who they claim stood around performing little or no work. In any event, the parties agreed to defer bricking until the danger of frost had passed in Spring, 1997.

In December, 1996, the Smaltzes prepared a list of concerns. The list was presented to the Bank and was the subject of a meeting with the Bank's representative, Mr. Smaltz, Schaller and Gordon Urmson.[2] The meeting was cordial, issues and dates were discussed and agreed upon.

Beginning in March, the Smaltzes began regular preparation of lists of things for completion ("Punch Lists"). There are Punch Lists dated March 21, 1997 and April 7, 1997 of items to be completed before the Debtor receives the next draw on the Smaltzes' construction loan. In a Punch List dated June 7, 1997, the two main issues in this case first arise in writing:

–Walls in basement are wet and will not dry up. This has also caused mold problems, which can be potentially serious. Contractor has known about this problem for several months.

–Furnace is not zoned…

Additional Punch Lists were prepared throughout June and July. Meetings were held with Bank representatives, the Smaltzes and Debtor's representatives. The Debtor lacked cash flow to address the most significant concerns regarding the furnace and the wet basement. The Debtor worked diligently to address the remaining issues but was unable to resolve them to the Smaltzes' satisfaction. The Smaltzes became concerned over certain acts of vandalism that they perceived were being perpetrated by Debtor's employees. The parties became more and more frustrated with each other and matters came to an end on July 28, 1997. The house was substantially complete. Minor items remained for completion, except for two problems that had not yet been addressed, the furnace and the wet basement. The Smaltzes advised Schaller to call in advance to schedule completion of the remaining work on the Punch Lists so they could be present when any further work was completed. Also on that date, Schaller and Mrs. Smaltz met at the house. There is some confusion about the conversation. Schaller understood that he and the Debtor's employees were to leave and not return to the job site. Mrs. Smaltz states that she told Schaller to get his belongings out of the garage as the painter needed to paint in that area. We credit Schaller's version as being consistent with Smaltz's demands on the project. No employee of the Debtor worked on the job after that date.

While construction proceeded, many changes were requested. Because of the lack of specific plans, there were more changes than usual. Debtor accommodated these changes at minimum cost. The parties were friends who trusted each other and therefore were not overly concerned about memorializing each small change. Numerous change orders were written at the end. The Smaltzes point out that there are some amounts that ap-

2. The Smaltzes and Dr. Joseph Conti, Mrs. Smaltz's father, were known to and good customers of the Bank. The Bank took an unusually active role in the construction process and the Smaltzes were able to exert unusual pressure on the Bank. The Bank acted in a somewhat arbitrary and capricious fashion in holding back payments to the Debtor at the Smaltzes' request even though the Bank's inspector had approved such disbursements.

pear on late change orders that they did not approve. We have no doubt that the changes were requested and that the charges are appropriate.

The Complaint filed by the Trustee asserts an amount of $55,301.39 owed by the Smaltzes. The figure of $55,301.39 appears to be in error. The amount of $55,301.39 is an amount that is shown in the Debtor's schedules as due from another job. The amount shown in the schedules due from the Smaltzes is $67,436.37. Debtor's records and the testimony of its bookkeeper indicate that the total due upon completion is $67,980.87. Debtor acknowledges that certain items remained

for completion and there was testimony that the $55,301.39 figure may have been derived from an offer of compromise. We find that the total claim is $67,980.87 and that the $55,301.39 figure which appears in the Complaint is a mistake; the amount of $55,301.39 is an erroneous amount due from a different customer.

The Smaltzes assert a counterclaim for breach of contract, for reasons of defective workmanship, negligent performance, failure to perform in a timely manner, negligent misrepresentation, and fraudulent misrepresentation. The Smaltzes assert a counterclaim and/or setoff for:

| | |
|---|---|
| Items included in contract paid for by homeowner | $ 3,572.08 |
| Items where homeowner went under the contract allowance | 4,270.00 |
| Repairs for defective workmanship | 37,840.00 |
| Cost of finishing incomplete work | 10,095.00 |
| | $55,777.08 |

*Law*

■ "Pennsylvania courts have recognized the existence of implied warranties of habitability and reasonably workmanlike construction upon executing a contract for the construction of a residential dwelling since at least 1972." *Bednarski v. Hideout Homes & Realty, Inc.,* 711 F.Supp. 823, 827 (M.D.Pa.1989). Upon executing a construction contract with a homeowner, the contractor impliedly warrants that the house will be constructed in a reasonably workmanlike manner and it will be fit for habitation as a residential dwelling. *Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771 (1972); *Fetzer v. Vishneski,* 399 Pa.Super. 218, 582 A.2d 23 (1990); and *Groff v. Pete Kingsley Building, Inc.,* 374 Pa.Super. 377, 543 A.2d 128 (1988).

■ The measure of damages for defective performance under a construction contract is the cost incurred to remedy the

defects. *Fetzer v. Vishneski,* 399 Pa.Super. 218, 582 A.2d 23 (1990).

> Further, once the homeowner has presented evidence as to the cost of remedying the defects, the burden is on the contractor to challenge this evidence.

> If the owner has had the repair or completion *performed* at the time of trial, the amount paid by the owner may be presumed to be reasonable, subject to rebuttal evidence by the contractor. The amount actually paid by the owner to another contractor for correction of the *defective* work, within a reasonable time after the breach, is strong and reliable evidence in determining the time and amount of damages.

*Id., quoting,* Annotation, *Modern Status of Rule as to Whether Cost of Correction or Difference in Value of Structures is Proper Measure of Damages for Breach of Construction Contract,* 41 A.L.R.4th 131 § 9, 1985 WL 287442 (1985) (citations omitted, emphasis added).

### Furnace System

■ Mr. Smaltz and Schaller discussed options for the furnace system during the planning process. The Smaltzes considered either two furnaces or a zoned system. The Smaltzes were also looking for ways to cut costs. Schaller advised that zoning was not needed, that an ordinary furnace system was adequate, and that the Smaltzes could save a couple thousand dollars without zoning. When the Contract was executed, it did not specify a zoned system. The Contract provided for a natural gas, forced air system.

Among the concerns on the Smaltzes' December, 1996 list is that "Contractor and heating subcontractor need to discuss heating plans with homeowner to determine size, model and make." Subsequently, a meeting was arranged with representatives of the heating contractor, Breese Heating and Cooling ("Breese"). Schaller was ill and unable to attend the meeting. The Smaltzes attended without Schaller or any representative of the Debtor.

The Smaltzes and Breese discussed options. No decision was made, but Mr. Smaltz knew that a zoned system was not included in the Contract price.

The house was drywalled and the furnace system was installed. After installation, Mr. Smaltz noted a 12 degree temperature difference between the first and second floors of the house. The Smaltzes raised the issue on the June 11, 1997 Punch List. "Furnace is not zoned." The issue was discussed at the meeting held on July 3, 1997 with the Bank's representative, Mr. Voysey. Mr. Voysey noted a need to determine "what does contract say?"

The Smaltzes moved into the house at the end of July. They had the furnace system balanced, different cold air returns and a second electronic filter installed with minimal results. The temperature differential between the first and second floors remained at 8–10 degrees.

The furnace that Debtor installed is inadequate for the house. The second floor of the house does not warm to a comfortable temperature in winter or cool to a comfortable temperature in summer. The Smaltzes have obtained estimates for a cure and assert that they are entitled to a credit of between $10,900–18,000 for the deficiency. We find that the Debtor had an obligation to provide a system that was adequate for the house and failed to do so. The Smaltzes are entitled to a credit of $10,900.

### Wet Basement Walls

■ In March or April, 1997, the Smaltzes became concerned about water seeping through the basement walls. Debtor believed that the dampness was customary and usual and expected it to dry in the ordinary course. Schaller and Gordon Urmson explained to the Smaltzes that once the dirt settled around the house, the clay/dirt would seal and keep the water out. When it didn't dry as expected, Debtor regraded the property around the house and ran dehumidifiers. Schaller acknowledges that the basement walls were still damp as of July 28, 1997 and that the next step in the correction process would probably have been digging all around the house to put in new drains and to parge the exterior of the block.

While the basement was damp, mold and mildew appeared on the wood in the basement. The Smaltzes feared that it was "block mold" which can cause physical harm or even death. The Debtor had the mold tested at its expense. The Smaltzes had their own test done. It was determined that the mold was common household mildew.

During the winter of 1997/1998, the dampness subsided during cold weather. In Spring, 1998, the walls again became damp. The Smaltzes hired David Excavating ("David") to correct the problem.

David excavated all around the house down to the footer. David found that the french drains Debtor had installed were crushed. The Smaltzes cleaned the walls and applied a sealer. David also installed a subsurface drainage system. David backfilled and regraded. The final grading was lower than it had been left by the Debtor.

The Smaltzes paid David $11,500 for the repair and $447.65 to Susi Building for materials. Thereafter, the Smaltzes have never experienced any dampness. Mr. Smaltz cleaned up the mold and with elimination of the dampness, the mold problem was gone. We find that the Smaltzes are entitled to a credit of $11,947.65 for this repair.

### Disbursements to Suppliers for Completion of Work

■ Disbursements were made from the Construction Loan Account directly to certain suppliers.

On July 18, 1997, Precision Painting was paid $2,860. D & D Electric was paid $1,720 for completion of electrical work. David was paid $11,500 for the work necessary to eliminate dampness in the basement. Perlow Refrigeration was paid $216.70 for repairs. The Smaltzes are entitled to credit for these expenses.

### Items Smaltzes Assert They Paid for that are Included in Contract

The Smaltzes list 14 items for which they assert that they paid for which are included in the Contract:

| | |
|---|---:|
| Shower—master bedroom | $ 686.84 |
| Toliets (sic)—mb & side bedroom | 445.05 |
| Tub/Shower—side bedroom | 575.00 |
| exhaust fans 3 | 268.00 |
| 3 valve T/S combo | 161.80 |
| 2—faucets master vanity | 160.00 |
| Side & back bedroom faucets | 160.00 |
| Powder room faucet | 75.00 |
| Mirrors above vanities | 218.14 |
| Basement faucet | 70.00 |
| Basement vanity | 50.00 |
| Basement vanity top | 68.00 |
| Plumbing—to install hot water & fix running | 184.25 |
| Air Care—Cleaned vents | 450.00 |
| TOTAL | $3,572.08 |

There are no invoices, checks or other evidence to support the stated amounts. The basement faucet, basement vanity, and basement vanity top are for the basement bathroom. The basement bathroom was not included in the Contract price.

An amount of $450 is included for cleaning vents. Debtor paid to have the furnace and duct work cleaned on June 25, 1997.

There is vague support for some of the claimed amounts. We will allow the Smaltzes a credit of 50% of the requested amount, or $1,786.04.

### Items Smaltzes Assert were Under Allowance

Smaltzes assert that they were $1,960 under the allowance for brick. Debtor

allowed $28,000 for brick. The amount paid was $30,800.

Smaltzes assert that they were $250 under the allowance for shingles. Debtor allowed $52 per square. The actual cost was $52.21 per square. Debtor left 2 extra squares of shingles on the premises which cost $104.42.

Smaltzes assert that they are entitled to a credit of $400 for a side bedroom closet which is "not as per blueprints," $1,000 for a "block wall that was in plans," $250 for "weatherguard not put on all of house," and $410 for cleaning after contractor. At trial, the Smaltzes produced no plans or evidence to indicate how the claimed amounts were determined. No invoices or canceled checks were introduced. At least some trash was removed by Schaller on his last day at the job site. We will allow the Smaltzes a credit of $1,000 for these items.

### Repairs to House and Items that Need Completed

Smaltzes provide lengthy lists of repairs and items that need completed. Smaltzes have arbitrarily assigned values to each item on the list to arrive at a total of $37,840 for repairs and $10,095 for items that need completed. The amount for repairs includes $10,900 for the furnace and $13,810 for the wet basement, items which we have already addressed.

The list of items to be completed includes electric work of $1,600. We allowed Smaltzes a credit of $1,720 for completion of electrical work as a disbursement directly to D & D Electric from the construction loan account.

The Debtor has acknowledged that certain items remained unfinished and required completion:

Shutters on front of house

Finish painting first floor and garage [3]

Garage door opener and receiver

Arch top trim to be installed

Second floor laundry chute door to be installed

Hang doors in basement bath (as an extra)

Smaltzes' lists far exceed anything acknowledged by Debtor. Again, Smaltzes produce no plans, or evidence to support how the claimed amounts were determined. No invoices or canceled checks to show that materials were bought or that the work was done and by whom. While some minor work remained uncompleted as of July 28, 1997, the amounts claimed as necessary to complete and repair the house are far overstated. We will allow the Smaltzes an additional credit of $4,000 for these items.

### Conclusion

Schaller and the Debtor worked diligently to provide the Smaltzes the Taj Mahal they wanted at a bargain price. Their efforts failed. The disruption of normal work flow by Smaltz is shown from the beginning when Mr. Smaltz, as a last minute change, brought his own workman on the job and removed the 13th row of basement blocks which had been partially completed. However, it was ultimately Debtor's responsibility to construct a house in a reasonably workmanlike manner that is fit for habitation as a residential dwelling. It failed to do so in certain respects as detailed in the within Opinion. Our final calculation is as follows:

Balance to Debtor on full Contract Price and Extras      $67,980.87

---

3. The Smaltzes were allowed a credit of $2,860 paid to Precision Painting from the construction loan account.

Credits due Smaltzes:

| | | |
|---|---:|---:|
| Furnace System | $10,900.00 | |
| Wet Basement Walls (David Construction and Susi Building) | 11,947.65 | |
| Disbursements to Suppliers for Completion of Work: | | |
| Precision Painting | 2,860.00 | |
| D & D Electric | 1,720.00 | |
| Perlow Refrigeration | 216.70 | |
| Items Smaltzes paid for | 1,786.04 | |
| Items Under Allowance | 1,000.00 | |
| Other repairs | 4,000.00 | 34,430.39 |
| Net amount due Debtor | | $33,550.48 |

By Order dated April 23, 2003, a net judgment in the amount of $33,550 was entered in favor of the Trustee taking into consideration both the Trustee's Complaint and the Smaltzes' Counterclaim.